**CASE NO. 25-1502**

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

BONNIE MANCHESTER, Plaintiff - Appellant,

v.

TOWN OF LUDLOW; TODD GAZDA, individually and in his official capacity as former Superintendent of Schools, Ludlow Public Schools; STACEY MONETTE, individually and in her official capacity as former Principal of Paul R. Baird Middle School; MARIE-CLAIRE FOLEY, individually and in her official capacity as former school counselor of Paul R. Baird Middle School; JORDAN FUNKE, individually and in her official capacity as former librarian of Paul R. Baird Middle School; Defendants - Appellees,

LUDLOW SCHOOL COMMITTEE; FRANK TIANO, individually and in his official capacity as Superintendent of Schools, Ludlow Public Schools, Defendants.

Appeal from the United States District Court for the District of Massachusetts, Springfield Division
Case No. 23-cv-30117-MGM
**APELLANT'S APPENDIX VOLUME 1 PAGES 001 - 0107**

Frank L. McNamara, Jr.
McNamara & Associates
24 Leominster Road
Lunenburg, MA 01462
(978) 333-9608
franklmcnamara@gmail.com
Ryan P. McLane
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
(413) 789-7771
ryan@mclanelaw.com

Mary E. McAlister
Vernadette R. Broyles
Child & Parental Rights Campaign, Inc.
5425 Peachtree Parkway, Suite 110
Peachtree Corners, GA 30092
770.448.4525
mmcalister@childparentrights.org
vbroyles@childparentrights.org
Attorneys for Plaintiff - Appellant

# TABLE OF CONTENTS – Vol. 1

1. Docket Sheet for Bonnie Manchester v. Town of Ludlow 3:23-cv-30117 MGM ……………………………………………………………………0001

2. Amended Complaint ………………………………………………………………..……...........0009
   Filed 3/12/2024

3. Memorandum and Order Regarding Defendant's Motion to Dismiss and Motion to Strike ……………………………………………........…..……….…..…..0081
   Issued 4/25/2025

4. Order of Dismissal …………………………………………………..…………… 0105
   Issued 4/25/2025

5. Notice of Appeal …………………………………..…..……………………… 0106
   Filed 5/23/2025

# United States District Court
## District of Massachusetts (Springfield)
## CIVIL DOCKET FOR CASE #: 3:23-cv-30117-MGM

| | |
|---|---|
| Manchester v. Town of Ludlow et al | Date Filed: 11/01/2023 |
| Assigned to: Judge Mark G. Mastroianni | Date Terminated: 04/25/2025 |
| Referred to: Magistrate Judge Katherine A. Robertson | Jury Demand: Plaintiff |
| Demand: $9,999,000 | Nature of Suit: 442 Civil Rights: Jobs |
| Case in other court: USCA - First Circuit, 25-01502 | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights (Employment Discrimination) | |

## Plaintiff

**Bonnie Manchester**          represented by          **Frank L. McNamara , Jr.**
McNamara & Associates
53 Wilder Road
Bolton, MA 01740
978-333-9608
Email: franklmcnamara@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan P. McLane**
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
413-789-7771
Email: ryan@mclanelaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Town of Ludlow**

represented by **David S. Lawless**
Robinson Donovan, P.C.
Tower Square
1500 Main Street
Suite 2300
Springfeild, MA 01115
413-732-2301
Fax: 413-785-4658
Email: dlawless@robinsondonovan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ludlow School Committee**
*TERMINATED: 03/12/2024*

**Defendant**

**Todd Gazda**
*individually and in his official capacity as former*
*Superintendent of Schools, Ludlow Public Schools*

represented by **David S. Lawless**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Frank Tiano**
*individually and in his official capacity as*
*Superintendent of Schools, Ludlow Public Schools*
*TERMINATED: 03/12/2024*

**Defendant**

**Stacey Monette**
*ndividually and in her official capacity as former*
*Principal of Paul R. Baird Middle School*

represented by **David S. Lawless**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

0002

**Defendant**

**Marie-Claire Foley**
*individually and in her official capacity as former school counselor of the Paul R. Baird Middle School*

represented by **David S. Lawless**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jordan Funke**
*individually and in her official capacity as former librarian of the Paul R. Baird Middle School*

represented by **David S. Lawless**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/01/2023 | 1 | COMPLAINT against Bonnie Manchester Filing fee: $ 402, receipt number AMADC-10114608 (Fee Status: Filing Fee paid), filed by Bonnie Manchester. (Attachments: # 1 Category Form, # 2 Civil Cover Sheet, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(McLane, Ryan) (Entered: 11/01/2023) |
| 11/02/2023 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Mark G. Mastroianni assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Katherine A. Robertson. (Phillips, Sophie) (Entered: 11/02/2023) |
| 11/02/2023 | 3 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Figueroa, Tamara) (Entered: 11/02/2023) |
| 11/02/2023 | 4 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered. REFERRING CASE to Magistrate Judge Katherine A. Robertson Referred for: Full Pretrial, No Dispositive Motions (ptn). (Figueroa, Tamara) (Entered: 11/02/2023) |
| 11/03/2023 | 5 | *Corrected Complaint* Errata by Bonnie Manchester to 1 Complaint, . (McLane, Ryan) (Entered: 11/03/2023) |
| 02/14/2024 | 6 | Judge Mark G. Mastroianni: ORDER entered. ORDER TO SHOW CAUSE Show Cause Response due by 2/28/2024. See attached PDF for details. (Lendon, Tyler) (Entered: 02/14/2024) |

0003

| | | |
|---|---|---|
| 02/23/2024 | 7 | WAIVER OF SERVICE Returned Executed by Bonnie Manchester. All Defendants. (Attachments: # 1 Supplement, # 2 Supplement, # 3 Supplement, # 4 Supplement, # 5 Supplement, # 6 Supplement) (McLane, Ryan) (Entered: 02/23/2024) |
| 02/29/2024 | 8 | Judge Mark G. Mastroianni: ORDER entered. ORDER TO SHOW CAUSE to Show Cause in writing within 14 days, or by **March 14, 2024**, why this action should not be dismissed for failure to prosecute. Should Plaintiff fail to comply with this order by March 14, 2024, the court will dismiss this action for failure to obey this order and failure to prosecute. *See e.g., Tower Ventures, Inc. v. City of Westfield,* 296 F.3d 43, 46 (1st Cir. 2002) ("[D]isobedience to court orders in and of itself, constitutes extreme misconduct (and, thus, warrants dismissal)."); *Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315(1st Cir. 1998) ("[A] litigant who ignores case-management deadline does do at his peril."). See attached order for complete details.*(Lendon, Tyler) (Entered: 02/29/2024) |
| 03/12/2024 | 9 | AMENDED COMPLAINT against All Defendants, filed by Bonnie Manchester. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(McLane, Ryan) (Entered: 03/12/2024) |
| 03/13/2024 | 10 | NOTICE of Appearance by Frank L. McNamara, Jr on behalf of Bonnie Manchester (McNamara, Frank) (Main Document 10 replaced on 3/14/2024) (Figueroa, Tamara). (Entered: 03/13/2024) |
| 03/13/2024 | 11 | RESPONSE TO ORDER TO SHOW CAUSE by Bonnie Manchester. (McNamara, Frank) (Entered: 03/13/2024) |
| 03/13/2024 | 12 | MOTION for Extension of Time to April 24, 2024 to File Response/Reply by Bonnie Manchester. (McNamara, Frank) (Entered: 03/13/2024) |
| 03/14/2024 | 13 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered granting 12 Motion to extend to April 24, 2024 the time for the defendants to file and serve their response to the plaintiffs amended complaint. (Zamorski, Michael) (Entered: 03/14/2024) |
| 03/19/2024 | 14 | NOTICE of Appearance by David S. Lawless on behalf of Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow (Lawless, David) (Entered: 03/19/2024) |
| 03/19/2024 | 15 | NOTICE of Appearance by Nancy Frankel Pelletier on behalf of Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow (Pelletier, Nancy) (Entered: 03/19/2024) |
| 04/22/2024 | 16 | Assented to MOTION for Extension of Time to May 15, 2024 to Respond to Amended Complaint by Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow.(Lawless, David) (Entered: 04/22/2024) |

0004

| | | |
|---|---|---|
| 04/23/2024 | 17 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered granting 16 Motion for Extension of Time to May 15, 2024 to Respond to Amended Complaint. (Zamorski, Michael) (Entered: 04/23/2024) |
| 05/15/2024 | 18 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and to Strike* by Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow.(Lawless, David) (Entered: 05/15/2024) |
| 05/15/2024 | 19 | MOTION for Leave to File Excess Pages by Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow. (Attachments: # 1 Exhibit)(Lawless, David) (Entered: 05/15/2024) |
| 05/16/2024 | 20 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 19 MOTION for Leave to File Excess Pages by Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow. (Lendon, Tyler) (Entered: 05/16/2024) |
| 05/16/2024 | 21 | MEMORANDUM in Support re 18 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and to Strike* filed by Marie-Claire Foley, Jordan Funke, Todd Gazda, Stacey Monette, Town of Ludlow. (Lawless, David) (Entered: 05/16/2024) |
| 05/29/2024 | 22 | MOTION for Extension of Time to 6/12/2024 to File *Opposition to Motion to Dismiss* by Bonnie Manchester.(McNamara, Frank) (Entered: 05/29/2024) |
| 05/30/2024 | 23 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 22 Motion for Extension of Time to File to 6/12/2024 to File Opposition to Motion to Dismiss by Bonnie Manchester.(Lendon, Tyler) (Entered: 05/30/2024) |
| 06/12/2024 | 24 | MOTION for Extension of Time to June 26, 2024 to File Response/Reply by Bonnie Manchester. (McLane, Ryan) (Entered: 06/12/2024) |
| 06/13/2024 | 25 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered granting 24 plaintiff's assented-to motion to extend to June 26, 2024 the time for plaintiff to respond to the defendants' motion to dismiss. Responses due by 6/26/2024 (Zamorski, Michael) (Entered: 06/13/2024) |
| 06/26/2024 | 26 | MOTION to Continue Response to Rule 12(b) Motion to Dismiss to 7/10/2024 , MOTION for Extension of Time to 7/10/2024 to File Response/Reply ( Responses due by 7/10/2024) by Bonnie Manchester. (McNamara, Frank) (Entered: 06/26/2024) |
| 06/27/2024 | 27 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered granting 26 plaintiff's assented-to motion to extend to July 10, 2024 the time for the plaintiff to file her opposition to the defendants' motion to dismiss. (Zamorski, Michael) (Entered: 06/27/2024) |

0005

| 07/24/2024 | 28 | MOTION for Extension of Time to 8/2/2024 to file *Opposition to Motion to Dismiss* by Bonnie Manchester.(McNamara, Frank) (Entered: 07/24/2024) |
|---|---|---|
| 07/25/2024 | 29 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered granting 28 Motion for Extension of Time to **8/2/2024** to file Opposition to Motion to Dismiss by Bonnie Manchester. (Lendon, Tyler) (Entered: 07/25/2024) |
| 08/02/2024 | 30 | MEMORANDUM in Opposition re 28 MOTION for Extension of Time to 8/2/2024 to file *Opposition to Motion to Dismiss* filed by Bonnie Manchester. (McNamara, Frank) (Entered: 08/02/2024) |
| 08/03/2024 | 31 | MOTION for Leave to File Excess Pages by Bonnie Manchester.(McLane, Ryan) (Entered: 08/03/2024) |
| 08/05/2024 | 32 | Magistrate Judge Katherine A. Robertson: ELECTRONIC ORDER entered granting 31 plaintiff's assented-to motion for leave to file excess pages. Plaintiff's memorandum in opposition to defendants' motion to dismiss shall not exceed 30 pages in length. (Zamorski, Michael) (Entered: 08/05/2024) |
| 08/05/2024 | 33 | Judge Mark G. Mastroianni: ELECTRONIC ORDER entered regarding 30 Memorandum in Opposition re 28 Motion for Extension of Time to 8/2/2024 to file Opposition to Motion to Dismiss filed by Bonnie Manchester; and 31 Motion for Leave to File Excess Pages by Bonnie Manchester. After reviewing the docket in this matter, Plaintiff's opposition to Defendants' motion to dismiss and motion to strike (Dkt. No. 30) is ordered stricken for failing to comply with Local Rule 7.1(b)(4). Under this provision, memoranda "opposing allowance of motions shall not, without leave of court, exceed 20 pages, double-spaced." See id. Plaintiff's opposition is 41 pages, double-spaced. Plaintiff did not seek leave of this court on or before August 2, 2024 to file a non-conforming brief. Rather, the docket reflects Plaintiff filed a motion seeking leave to file an overlength brief on Saturday, August 3, 2024. Consequently, the brief at Docket No. 30 is an unauthorized filing which fails to comply with the Local Rules of the District of Massachusetts, and it is therefore ordered stricken. Plaintiff shall file a corrected opposition, which may not exceed 30 pages, by August 9, 2024.(Lendon, Tyler) (Entered: 08/05/2024) |
| 08/09/2024 | 34 | Opposition re 18 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and to Strike* filed by Bonnie Manchester. (McLane, Ryan) (Entered: 08/09/2024) |
| 09/26/2024 | 35 | Set/Reset Deadlines as to 18 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and to Strike*. Motion Hearing set for **11/20/2024 at 11:00 AM** in Hampden Courtroom (In person only) before Judge Mark G. Mastroianni. (Lendon, Tyler) (Entered: 09/26/2024) |
| 11/20/2024 | 36 | Electronic Clerk's Notes for proceedings held before Judge Mark G. Mastroianni: Motion Hearing held on 11/20/2024. (Attorneys present: Atty McNamara, Jr. for Plaintiff, Atty Lawless for Deft.) |

| | | |
|---|---|---|
| | | Court hears arguments re: [18] MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and to Strike* filed by Stacey Monette, Jordan Funke, Todd Gazda, Marie-Claire Foley, Town of Ludlow. Court takes the matter under advisement. A separate Order shall issue.<br><br>(Court Reporter: Leigh Gershowitz at Leigh_Gershowitz@mad.uscourts.gov.) (Rivera, Christina) (Entered: 11/20/2024) |
| 04/25/2025 | 37 | Judge Mark G. Mastroianni: ORDER entered. MEMORANDUM AND ORDER. See Memorandum and Order for complete details. (TF) (Entered: 04/25/2025) |
| 04/25/2025 | 38 | Judge Mark G. Mastroianni: ORDER entered. ORDER DISMISSING CASE. See Order for complete details. (TF) (Entered: 04/25/2025) |
| 05/23/2025 | 39 | NOTICE OF APPEAL as to [38] Order Dismissing Case, [37] Memorandum & ORDER by Bonnie Manchester. Filing fee: $ 605, receipt number AMADC-11027830 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 6/12/2025. (McLane, Ryan) (Entered: 05/23/2025)** |
| 05/23/2025 | 40 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re [39] Notice of Appeal. (MAP) (Entered: 05/23/2025) |
| 05/23/2025 | 41 | USCA Case Number 25-1502 for [39] Notice of Appeal, filed by Bonnie Manchester. (MAP) (Entered: 05/23/2025) |

| | | | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-30117-MGM |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

| | |
|---|---|
| BONNIE A. MANCHESTER,<br><br>Plaintiff<br><br>v.<br><br>TOWN OF LUDLOW,<br>TODD H. GAZDA, individually and in his official capacity as former Superintendent of Schools, Ludlow Public Schools,<br>STACEY MONETTE, individually and in her official capacity as former Principal of Paul R. Baird Middle School,<br>MARIE-CLAIRE FOLEY, individually and in her official capacity as former school counselor of the Paul R. Baird Middle School, and<br>JORDAN FUNKE, individually and in her official capacity as former librarian of the Paul R. Baird Middle School,<br><br>Defendants | Civil Action No. 3:23-cv-30117<br><br><br>**AMENDED COMPLAINT<br>FOR<br>INJUNCTIVE RELIEF, DAMAGES,<br>AND<br>DECLATORY JUDGMENT**<br><br><br><br>**JURY TRIAL DEMANDED** |

## I.  INTRODUCTION

1.      This Complaint seeks to vindicate the rights of plaintiff Bonnie A. Manchester ("Ms. Manchester" or "plaintiff") who, on May 19, 2021, was terminated from her decades-long employment as a teacher at Paul R. Baird Middle School in Ludlow, Massachusetts ("Baird" or the "School") after having been disciplined and placed on paid administrative leave by the School three (3) months earlier for "conduct unbecoming a teacher". What constituted the purportedly unbecoming conduct was a single, brief, private conversation between Ms. Manchester and the father (the "Father") of an *eleven (11) year-old female student*, held after

0009

school and outside school property. In that conversation plaintiff informed the Father that his daughter, her student (the "Female Child"), had announced in an email transmitted days earlier to a dozen of her teachers (i) that she was "genderqueer" and (ii) had specified her so-called "preferred pronouns".

2. Although this lawsuit arises out of the transgender debate that has engulfed the country in recent years, this case is not about the civil rights of transgendered people. Nor is it about the rights of gender questioning children. Those rights are not at issue; indeed they are unassailable. Rather, this case is about the civil rights of a forty-nine (49) year-old female teacher. These rights too should have been unassailable; but they were not. Instead, they were aggressively traduced by defendants who pursued a years-long bullying campaign and conspiracy against Ms. Manchester that culminated in her termination.

3. In sharing information about the eleven (11) year old Female Child with the child's Father, plaintiff was engaging in core speech and association guaranteed by the First Amendment, speech that defendants subsequently, and perversely, characterized as "conduct unbecoming a teacher" and cited as the grounds for first punishing and subsequently terminating Ms. Manchester from her employment.

4. The fact that such communications between teachers and parents on subjects affecting the health and well-being of the latter's children, especially under-age, at-risk children, has been integral to all systems of education since the dawn of history did not matter to defendants.

5. Worse (if that is possible), the fact that the School recognized the importance of such parent-teacher communications, particularly in regards to the "families' home language, *culture*, and *values*" (*see infra*, ¶ 41, emphasis supplied), by making such communication a

0010

criterion in the School's evaluation forms for teachers, did not matter to defendants.

6. Worse still, the fact that there was no articulated School rule, policy, or guideline, written or oral, prohibiting the kind of teacher-parent communication and association in which plaintiff engaged, and that was seized upon as grounds for her termination, did not matter to defendants.

7. Still worse, the fact that the content of plaintiff's speech conveyed to the Father in this case (i) was made at the specific request of the Female Child herself, (ii) has never been objected to by the parents of the Female Child, and (iii) may have been a vital step in the parents seeking and obtaining valuable and perhaps life-saving psychological counseling for the at-risk Female Child, that too did not matter to defendants.

8. Even worse, the fact that defendants' termination of plaintiff for engaging in protected speech with the Father constituted classic First Amendment retaliation/viewpoint discrimination did not matter to defendants.

9. But worst of all, plaintiff's termination was not an isolated event. It was the culmination of a multi-year saga involving numerous meetings, reports, interviews, emails, letters, shifting and amorphous justifications, and persistent and evolving efforts on the part of defendants to marginalize plaintiff in the Baird community and make their inexcusable conduct towards her internally coherent in the face of serious questions concerning its legality.

10. Odious as all this is when viewed in the abstract, the actions of defendants chronicled in this Complaint become even more vile considering that they were deployed against a woman who, in spite of severe physical disabilities, managed to compile an exemplary record of achievement during her twenty-three (23)-year career at Baird teaching students in grades six (6) through eight (8), many of whom were at-risk.

0011

11. But despite Ms. Manchester's sterling record, she simply had to go. So defendants, resorting to treachery and intrigue, engaged in a civil conspiracy that not only traduced norms of fundamental fairness but violated the rule of law, core American freedoms, and plaintiff's civil rights, including, without limitation: Ms. Manchester's First Amendment rights to freedom of speech and association, her Fourteenth Amendment rights to due process and equal protection, her civil rights guaranteed under the Constitution of the Commonwealth of Massachusetts, and her rights under the Massachusetts Civil Rights Act (G. L. Ch. 12, §§ 11H, 11I).

12. By their conduct, defendants have worked nearly incalculable harm upon an honorable woman.

13. Plaintiff now brings this action against defendants seeking: (i) declaratory and injunctive relief in the form of a declaratory judgment that defendants' vague, arbitrary, capricious, discriminatory, and heretofore unarticulated (much less written) action of prohibiting and punishing communications between parents and teachers concerning their young children's gender identity is constitutionally impermissible and, further, that this Court issue an Order enjoining defendants from continuing such action; (ii) monetary and other damages; (iii) compensatory damages; (iv) reinstatement with backpay; (v) punitive damages; and (vi) attorneys' fees, expenses, and costs pursuant to 42 USC § 1988.

## II. <u>JURISDICTION AND VENUE</u>

14. This Court has subject matter jurisdiction under 28 USC §§ 1331 and 1343(a)(3) and (4). This case arises under a federal cause of action pursuant to 42 U.S.C. § 1983. This Court has supplemental jurisdiction over the Massachusetts Civil Rights Act claim under 28 U.S.C. §1367. Jurisdiction is also proper under 28 U.S.C. § 1332(a)(1) as the amount in controversy

0012

exceeds $75,000 and is between citizens of different states.

15. An actual controversy exists between the parties that involves substantial constitutional issues as plaintiff alleges that defendants' conduct has and continues to violate the United States Constitution and deprive plaintiff of her rights thereunder while defendants are expected to assert that their conduct comport with the United States and Massachusetts Constitutions and Massachusetts law.

16. Venue is proper in this Ludlow Schools under 28 U.S.C. §1391(b). Most defendants reside or have their principal place of business in this judicial Ludlow Schools, and a substantial part, if not all, of the events and omissions giving rise to this action occurred in this judicial Ludlow Schools.

17. This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57, and to issue injunctive relief under Federal Rule of Civil Procedure 65.

18. This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. §1988.

### III.  PARTIES

19. Plaintiff Bonnie A. Manchester is a forty-nine (49) year-old resident of the Town of Ludlow who served for twenty-three (23) consecutive years as a middle school teacher at Baird.  Plaintiff resided in the City of Chicopee, Massachusetts when the events giving rise to this Complaint occurred.

20. Defendant Town of Ludlow ("Ludlow"), with a principal address of 488 Chapin Street, Ludlow, MA 01056, is a body corporate under M. G. L. c. 40, §1, with the capacity to sue and be sued. M. G. L. c. 40, §2,

5

0013

21. Defendant Todd H. Gazda ("Gazda") is the former Superintendent of the Ludlow Public Schools ("Ludlow Schools") and is, upon information and belief, currently a resident of West Hartford, Connecticut. When the events giving rise to this Complaint occurred, Gazda, as Superintendent, acted as the chief executive, educational, and administrative officer of the Ludlow Schools. Pursuant to M. G. L. c. 71, §59, his responsibility and authority included oversight, management, and control of the Ludlow Schools in a manner consistent with state law, the Constitution of the United States, and the policy determinations of the Ludlow School Committee. He is sued in his individual capacity.

22. Defendant Stacy Monette ("Monette") is, upon information and belief, a resident of Brewster, Massachusetts and at all relevant times was the principal of Baird, one of the Ludlow Schools. Pursuant to M. G. L. c. 71, § 59B, defendant Monette, as principal, was the educational administrator and manager of Baird whose responsibility and authority included not only the management of the School and School property, subject to the supervision and direction of the Superintendent, but also the hiring and termination of School personnel, subject to the prior approval of the Superintendent. M. G. L. c. 71, § 59B. She is sued in her individual capacity.

23. Defendant Marie-Claire Foley ("Foley") is, upon information and belief, a resident of Belchertown, Massachusetts and at all relevant times was a Grade 6 School Counselor at Baird. She is sued in her individual capacity.

24. Defendant Jordan Funke ("Funke") is, upon information and belief, a resident of Winooski, Vermont and at all relevant times was the librarian of Baird. She is sued in her individual capacity.[1]

---

[1] Funke's employment with the School ended in June of 2021. As of this writing, plaintiff is unaware of Funke's preferred pronouns.

6

0014

# IV. STATEMENT

A.        Plaintiff's exemplary record as a middle school teacher ……………….. 7

B.        Defendants' history of hostility and bad faith towards plaintiff ………. 14

C.        Plaintiff's medical history ………………………………………… 28

D.        Plaintiff's purportedly "unbecoming" conduct ………………..……….. 29

E.        Defendants' retaliation against plaintiff and plaintiff's termination ..…… 41

## A. Plaintiff's Exemplary Record as a Middle School Teacher

25. After an undergraduate career during which she excelled not only academically but also athletically as an outstanding soccer player, Ms. Manchester was awarded a BS degree with a double major in elementary education and Psychology from American International College in Springfield, Massachusetts in 1996.

26. For the next two (2) years Ms. Manchester was employed as a substitute teacher in the Springfield and Ludlow (Massachusetts) school systems. Then, in 1999, while working for the Key Program in Springfield, Ms. Donna Hogan, then principal of Baird, persuaded plaintiff to apply for a full-time teaching position with the Ludlow Schools for grades six (6) through eight (8).

27. Plaintiff applied, was hired, and began full-time employment at Baird on October 18, 1999. The glowing letters of recommendation that accompanied Ms. Manchester's application to Baird foreshadowed an exemplary career in education that was about to unfold. During her twenty-three (23)-year tenure at the School, Ms. Manchester was universally beloved by students, admired by parents, liked and respected by her peers, and esteemed by those administrators whose duty it was to assess her performance.

0015

28.     The personnel file of Ms. Manchester reflects that from her earliest days at Baird, her gifts as a middle school educator were recognized and valued by all. Not only is plaintiff's record without blemish; it is filled with encomiums from parents, peers, and principals attesting to her excellence. The following is but a small sampling:

"These students have grown and thrived under Ms. Manchester's watchful eye…. We are very happy that she is at Baird …." [2]

"Congratulations! … You have demonstrated a high level of skill and professionalism. You are an asset to our organization. Thank you for your dedication." [3]

"You are a role model to all – personifying the teacher who works diligently inside and outside of her classroom." [4]

"… thank you so much for sharing, and taking the time to send his work to me, i [*sic*] really think you are doing a great job with him, and i [*sic*]  thank you so much. he [*sic*] has been comming [*sic*] home full of confidence and happy.[5]

29.     Amidst these general accolades, there is one particular strength that shines forth with luminous clarity: Ms. Manchester's truly extraordinary ability to deal effectively with at-risk students and those experiencing behavioral and emotional issues.

30.     As with her more general skills as a teacher, this particular gift of being able to look into the troubled heart of the at-risk middle school student and to provide healing and hope was noted and admired early and often by Ms. Manchester's superiors at Baird, so much so that by her third year as a teacher (2001), plaintiff was overseeing the School's so-called "Substantially Separate Program", offered to students whose emotional needs required a behavioral modification program.

---

[2] December 13, 2000 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[3] September 17, 2004 letter of commendation from John J. Welch, former Superintendent of Ludlow Public Schools.
[4] May 4, 2005 letter of commendation from Donna M. Hogan, former principal of Paul R. Baird Middle School.
[5] February 2, 2007 email to plaintiff from a grateful mother of a student.

0016

31.     As with Ms. Manchester's other performance evaluations, those memorializing her teaching skills in the area of at-risk students also sparkle, perhaps even more so. Here, by chronological order in which they were dispensed, is a brief sampling:

Ms. Manchester was hired for this position only a few weeks ago. The change in this classroom is dynamic. The atmosphere is positive, caring, and consistent. *This is one classroom where one teacher has made a tremendous difference.... Keep up the good work*!" [6] [Emphasis supplied.]

"*She has brought stability to these students' lives, and she has also given them confidence in their own abilities and hope for the future*. Ms. Manchester has been a true success in this classroom of students with many emotional needs." [7] [Emphasis supplied.]

"Ms. Manchester's program provides an opportunity for at-risk students to stay on campus and succeed in their own community.... we are very happy that she is at Baird, and that our students with such emotional needs can be successfully serviced here, as well.... *Please share your classroom management strategies with your peers*." [8] [Emphasis supplied.]

"This program [the Substantially Separate Program] is very successful at Baird due to Ms. Manchester's direction and skills. Her students are the most challenging in the building, yet she has provided them with a home base that is nurturing, structured and accepting. *Every single student has improved under her guidance. .... [She] keeps parents informed of their children's progress in clear terms every day. We are also planning some parent information nights during the next school year. Ms. Manchester would be a valuable source as a panelist discussing adolescent behavior."* [Emphasis supplied.] [9]

"She has been extremely successful over the years in addressing her students' emotional needs while continuing their individual academic programs.... *Ms. Manchester makes classroom management of at-risk students look easy.* She is patient, repeats questions, guides answers, and keeps students on task. Her students respond to her established routines, her point system, and her obvious acceptance of each individual. For many, she is the most responsive adult they see all day. *Her students are better people because of her. Please continue to share your classroom management strategies with your peers.*"

---

[6] December 13, 1999 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[7] May 11, 2000 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[8] December 13, 2000 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[9] April 13, 2001 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.

0017

[Emphasis supplied.] [10]

"Ms. Manchester continued to challenge her students to think for themselves. *Ms. Manchester is a veteran working with at-risk students in a behavioral classroom.* She is patient with interruptions, but she is a pro at bringing them back to the task at hand. She is relaxed but firm with them, and *it is obvious from their responses that they feel safe and confident in her challenging classroom. Please continue to share your expertise in working with at-risk students with your colleagues at Baird.*" [Emphasis supplied.] [11]

32. Despite these sparkling evaluations, plaintiff did not allow success as a middle school teacher to "go to her head". Throughout her more than two (2) decades of service to the School, Ms. Manchester strove constantly to improve as a teacher, registering for courses and seminars that honed her professional skills so that she might better serve others.

33. The following are a few of the entities from which plaintiff sought out and received courses and instruction in various areas of professional development, and the years of her enrollment: American International College, Springfield (2000, 2002 & 2003), Plymouth State College (2003), Crisis Prevention Institute, Inc. (2008), the University of Massachusetts (2012), the Bureau of Education & Research (2015), the Research for Better Teaching (2017), Fitchburg State University (2017), and Google-University of La Verne (2018).

34. Perhaps the high point of Ms. Manchester's professional development came in July 2003, when she successfully completed the requirements for a Masters Degree in Special Education from American International College in Springfield, Massachusetts, receiving her diploma the following May, with a cumulative GPA of 3.965 and a semester GPA of 4.000.

35. In addition, to these formal initiatives, plaintiff also earned educator's certificates and several special licensures in elementary and special needs education from the

---

[10] December 13, 2001 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.
[11] December 14, 2005 Ludlow Public Schools Formal Observation Report authored by Ms. Donna M. Hogan, former principal of Paul R. Baird Middle School.

0018

Commonwealth of Massachusetts Department of Elementary and Secondary Education ("DESE").

36. Not surprisingly, as a result of Ms. Manchester's innate gifts as a teacher, her diligent efforts at professional development, her magnanimity towards peers,[12] and her empathetic approach towards students, she became not only a highly credentialed member of the School community but one highly sought after to fill many of the extracurricular roles created by the School.

37. Thus, in addition to her formal teaching duties,[13] plaintiff has served in several extracurricular positions, including, without limitation, the following: Special Education Coordinator for the School, MCAS Teacher, MCAS Tutor, Instructional Support Teacher Yearbook Advisor, CO-Club Advisor, coordinator of the School's teams participating in Junior Achievement in Western Massachusetts, participant in the School's Peer Coaching process, and as a volunteer on committees designed to improve the educational environment of the School in areas such as anti-bullying and improvement of attendance.

38. Beginning in September 2013, the School adopted a new evaluation protocol for teachers that entailed evaluations every two (2) years. The forms used for these evaluations (the "Forms") contained a rubric that incorporated four (4) general areas or "standards" ("Standards") upon which teacher performance was based: Standard I: Curriculum, Planning and Assessment; Standard II: Teaching All Students; Standard III: Family and Community Engagement; and Standard IV: Professional Culture.

39. The Forms broke each of the four (4) Standards down into sub-categories or

---

[12] Plaintiff's personnel file reflects numerous instances of her generosity towards peers, even to the point of donating sick days for use by other teachers.
[13] Since August 29, 2011, Ms. Manchester has held the position of Social Studies Teacher.

0019

"Elements". A total of thirty-three (33) different Elements were subsumed under the four (4) Standards. Each Element permitted a teacher to be rated according to a scale that ran from lowest to highest as follows: "Unsatisfactory", "Needs Improvement", "Proficient", and "Exemplary".

40.    During her first set of evaluations under the new system covering the period from September, 2013 through May, 2015 (the "First Evaluation"), plaintiff recorded an exceptional performance, never receiving an evaluation on any of the thirty-three (33) elements that was less than "Proficient", and on thirteen (13) of the Elements receiving the highest evaluation of "Exemplary".

41.    An especially relevant criterion was Standard III of the Forms, that rated teachers in the area of "Family and Community Engagement". One of the five (5) "Elements" under this Standard is entitled "Parent/Family Engagement". To attain a rating of "Exemplary" for this Element, a teacher must meet a level of engagement with the student's family described as follows:

> "Successfully engages most families and sustains their active and appropriate participation in the classroom and school community."
> [Emphasis supplied.]

To attain a rating of "Proficient" under this Element, as Ms. Manchester did in her 2013-2015 evaluation, a teacher must meet a School-articulated criterion that reads thusly:

> "Uses a variety of strategies to support every family to participate actively and appropriately in the classroom and school community."

42.    A second Element under Standard III is entitled "Two-Way Communication". To attain a rating of "Exemplary" under this Element a teacher must meet a criterion that reads in part as follows:

> "Regularly uses a two-way system that supports *frequent,*

12

0020

*proactive* and *personalized communication with families about student performance and learning."* [Emphasis supplied.]

To attain a rating of "Proficient" under this Element, as Ms. Manchester did in her 2013-2015 evaluation, a teacher must meet a School-articulated criterion that reads thusly:

*"Regularly uses two-way communication with families about student performance and learning* and responds promptly and carefully to communications from families." [Emphasis supplied.]

43.     A third Element under Standard III is entitled "Culturally Proficient Communication". To attain a rating of "Exemplary" under this Element, a teacher must meet a School-articulated criterion that reads in part as follows:

"Always communicates respectfully with families and demonstrates understanding and *appreciation of* different families' home language, *culture, and values."* [Emphasis supplied.]

To attain a rating of "Proficient" under this Element, as Ms. Manchester did in her 2013-2015 evaluation, a teacher must meet a School-articulated criterion that reads thusly:

"Always communicates respectfully with families and demonstrates understanding of and *sensitivity to* different families' home language, *culture, and values."* [Emphasis supplied.]

The thin ceiling that separates a "Proficient" and an "Exemplary" rating under this Element is shattered when a teacher exhibits not merely "sensitivity to" different families' culture and values (Proficient) but actual "appreciation of" those cultures and values (Exemplary).

44.     During her second evaluation under the new system that encompassed the period running from September, 2015 through May, 2017 (the "Second Evaluation"), Ms. Manchester recorded a performance that was, if anything, even more exemplary than that reflected in her First Evaluation. Of the thirty-three (33) elements on which she was rated in the Second Evaluation, plaintiff received an evaluation of "Exemplary" on twenty-six (26), and "Proficient"

0021

on seven (7). *Cf.*, ¶ 42.

45.     Despite her superlative performance as recorded in the Second Evaluation, in none of the five (5) Elements subsumed under Standard III ("Family and Community Engagement") did plaintiff demonstrate improvement beyond the rating of "Proficient" attained in each of those five (5) Elements in the First Evaluation.

46.     As a result of her excellent, but static, performance in all five (5) Elements contained in Standard III ("Family and Community Engagement"), Ms. Manchester was determined in entering the next evaluation period to demonstrate improvement in this area (i) by "engag[ing] … families and sustain[ing] their active and appropriate participation in the classroom" (*see supra*, ¶ 41) (ii) through more "frequent proactive and personalized communication with families" (*see supra*, ¶ 42), and (iii) by "demonstrat[ing] understanding and appreciation of different families' home language, culture, and values". *See supra*, ¶ 43.

**B.     <u>Defendants' History of Hostility and Bad Faith Towards Plaintiff</u>**

47.     In 2012, Sheryl Stanton, then principal of Baird, hired defendant Jordan Funke as the School librarian.

48.     Funke has a history as an LGBTQ+ activist,[14] and at the time of her hiring, was, upon information and belief, a biological woman "transitioning" from female to male.

49.     Funke had no teaching responsibilities at the School, was not assigned a classroom, and, at least initially, had little, if any, formal contact with students beyond those occasioned by her role as librarian.

50.     Despite this, since her earliest days at Baird Funke had managed to be a controversial and polarizing figure. She embraced the role of *agent provocateur* and did little to disguise the fact that she was dedicated to a not-so-hidden agenda. That agenda, in Ms.

---

[14] A brief biography of Funke is accessible through the website translategender.org, unless removed.

Manchester's view, had little, if anything, to do with education but a great deal to do with ensuring that impressionable middle school children were introduced to a highly sexualized view of the world that was as controversial as it was harmful.

51. Funke first began to raise eyebrows among parents and teachers in September 2014 when she displayed in the School library posters promoting newly acquired library books by an author named John Green that many considered far too explicitly sexualized for middle school students.

52. When a number of parents complained to the School not only about the posters but also about the judgment of defendant Funke in displaying them, Funke promptly removed the posters, claiming, disingenuously, that she had not carefully examined the posters before displaying them.

53. The following year, 2015, defendant Funke, either alone or with others, began slyly altering the character of the Baird library through a two-pronged strategy that consisted of: (i) removing classic volumes from the shelves, and (ii) introducing new books into the School's library under a category devised by Funke and misleadingly entitled "Health and Science".

54. A number of these new books that Funke introduced contained sexually explicit content - either in the form of illustrations, explicit descriptions of sexual activity, or both. Some promoted a gay lifestyle, others trans. All advanced a view wherein gender confusion, sexual experimentation, promiscuity, or all three were considered normal.

55. Parents began to notice; and to complain. In 2015, Ms. Cheryl Patineau, a parent of a sixth (6th) grade daughter, objected to a book entitled *CUT* that had been introduced to the Baird library by defendant Funke.

56. Following the complaint by Ms. Patineau, the parents of two (2) other sixth (6th)

0023

grade children raised objections about other books in circulation at the School library

57.     One of those parents, Ms. Heather Cruz, a member of the faculty at the University of Connecticut, had grown concerned over the nature of certain sexually-charged questions being posed to her by her eleven (11) year-old daughter. Upon investigation, Ms. Cruz discovered that Funke had recommend to her daughter, Abby, a book entitled *A Court of Mist and Fury*, the second volume in a series entitled *A Court of Thorns and Roses*. After reviewing the book, Ms. Cruz concluded that its sexualized content was absolutely inappropriate for middle school students and complained to the School. The School quietly removed the book from the Baird library.

58.     The content of some of the books that Funke introduced was readily discernible from their titles. For example, one book, *Sex is a Funny Word* by Corey Silverberg, contains graphic illustrations and descriptions of sexual activity;[15] another entitled *Gender Queer: A Memoire* is a so-called "graphic novel" containing images of teens engaged in oral sex that are so graphic that even Facebook and Instagram flagged posts containing them for violating those sites' policies against pornography;[16] and *Gender Queer Workbook,* a companion volume to *Gender Queer,* was described as a guide for teens and young adults exploring gender identity.

59.     In other instances, Funke introduced books into the Baird library whose inappropriate, indeed offensive, content was camouflaged beneath innocuous titles. One such book entitled *Beyond Magenta* was described as a groundbreaking work of LGBTQ+ literature, and featured, among other things, descriptions of pedophilia and a child protagonist who has

---

[15] Other titles introduced into the library by Funke include: a series entitled "A Court of Mist and Fury", "Gender Queer Workbook", "Perfect Chemistry", "Kiss 8", and the so-called "graphic novels" (i.e. comic books) "Speak" and "Shout", each of which also contained graphic descriptions of sexual activity, and, in some instances graphic illustrations.

[16] *See* https://www.theepochtimes.com/new-york-education-department-promotes-sexually-explicit-book-for-national-reading-event_4314803.html

0024

been sexually abused and exploited since infancy. So lurid are the contents of these books that decorum prevents even a sampling being included as an exhibit to this Complaint.

60. Since her arrival at Baird, Funke had been lobbying the School administration to launch a program known by its acronym "DIRT" (Directed Individual Reading Time). DIRT enshrined a concept that seemed innocent enough: a fifteen (15)-minute enrichment period each day during which every student would have the opportunity, and the obligation, to read books not only beyond the scope of those assigned in class but also free from the supervision and guidance of adults and teachers. In September of 2019 the school introduced the DIRT program. Whatever good intentions may have inspired it, the DIRT program provided Funke, who theretofore had no reason to be interacting with students on a regular basis, much less assigning reading materials to them, a pretext for doing both.

61. Although the nature of the books introduced by Funke remained for a time "under the radar", the institution of the DIRT program caused more and more parents and teachers to became aware of the highly offensive content to which Funke was exposing their children and students. When the predictable parental objections ensued, the response of the School was to implement a policy allowing parents to opt their children out of the DIRT book choices being advocated by defendant Funke.

62. Since the Fall of 2016 Ms. Manchester had been aware of the Baird library book controversy, but it was sometime later that she and Funke actually clashed.

63. The *casus belli* was an incident that occurred in the early Spring of 2017, after Ms. Manchester had given the sixth (6th) grade students in her Ancient History Class a research assignment on Greek mythology. Not yet aware of defendant Funke's practice of introducing middle school children to sexually inappropriate material, Ms. Manchester had included Funke in

0025

her lesson plan as one of the persons the students could consult for source material. Plaintiff soon learned that Funke, under the pretext of assisting several sixth (6th) grade students in their research, had provided them with videos depicting explicit, and possibly criminal, sexual activity.

64.    The content of these videos was such that it would have raised eyebrows had an adult supplied them to college-age students; that Funke supplied them to impressionable and innocent sixth (6th) graders struck Ms. Manchester as perverse and inexcusable. Plaintiff confronted Funke directly about the incident and complained to Laura O'Keefe, the head of the Social Studies Department, and to defendant Monette; but defendant Monette did nothing. For her part Ms. Manchester was thereafter careful not to include Funke in her lesson plans.

65.    Prior to the incident involving the Greek mythology videos, plaintiff had been aloof from the simmering controversy triggered by Funke's introduction of inappropriate, sexualized books to the School library, preferring to let concerned Baird parents, and the School's administration, take the lead. But with this incident, Ms. Manchester became outspoken, raising the alarm among parents and fellow teachers, and forcefully voicing her concerns to defendants Monette and Gazda. Plaintiff also attempted to speak to defendant Funke directly; but when she did so, Funke childishly sabotaged her efforts by exhibiting to Ms. Manchester photographs on Funke's cell phone that plaintiff deemed inappropriate.

66.    In part because of Ms. Manchester's efforts, the controversy surrounding Funke and the Baird library soon attracted the attention of the Ludlow School Committee, much to the chagrin of defendants Monette, Gazda and Funke, among others. As a result, the School Committee approved on May 23, 2017 a protocol whereby a parent or teacher concerned about the suitability of a book or other material in the Baird library could initiate a review process to

0026

determine its appropriateness for middle school children.

67.	Defendant Funke's questionable behavior was not limited to introducing twisted and offensive material to Baird middle school children. Funke had a particular appetite for slandering Baird teachers who crossed her or did not share her views as to the sort of materials to which middle school children should be exposed.

68.	On one occasion, Funke spread false and malicious rumors among certain students at Baird concerning Ms. Angie Testori, a seventh (7th) grade English teacher, claiming, incorrectly, that Ms. Testori did not like certain students. When Ms. Testori, and the students themselves, complained to then-principal Joseph Langone, Langone directed defendant Funke to write a letter of apology to Ms. Testori.

69.	By the Fall of 2019, following two years of simmering tension between Ms. Manchester and defendants Gazda, Monette, Funke, and Foley, the library book controversy had spilled over to other members of the Baird staff. Two camps formed and battle lines were drawn: Ms. Manchester, who continued to press the issue with defendants Gazda, Monette, Funke, and Foley, was the *de facto* leader of one camp, while those four (4) defendants were arrayed against plaintiff in the other.

70.	Plaintiff was especially disappointed in, and outspokenly critical of, defendant Monette, who, as principal of Baird, had demonstrated little, if any, leadership in the controversy surrounding the objectionable books and other materials introduced by Funke.

71.	Initially defendant Monette appeared to have washed her hands of the issue, announcing in frustration at one School staff meeting that "It [the issue of the books] was dealt with and I'm not talking about it." But by the Fall of 2019, Monette had clearly joined forces with defendant Funke, confronting and, indeed, belittling those teachers, including Ms.

19

0027

Manchester, who opposed Funke's introduction of objectionable books and material into the School library.

72. The animosity directed towards Ms. Manchester would occasionally descend to humorously adolescent depths, of the kind one would more likely expect to find among college sorority sisters than among professional educators. For example, in the Fall of 2019, defendant Monette and her Baird staff allies organized a day when all teachers sympathetic to Monette wore pink to school (purportedly defendant Monette's favorite color) in a show of solidarity with her against plaintiff. One teacher at the School, in a text message to another teacher, explained the reasons for this manifestation of support for Monette: "a faculty member [Ms. Manchester] that [*sic*] has been giving her [Monette] a very hard time almost to the point of having [*sic*] her resign."

73. The targeting of Ms. Manchester was not limited to juvenile, color-based expressions of solidarity by members of the School staff who disagreed with her. Ms. Manchester's increased outspokenness over the growing dispute involving sexually explicit books in the School library resulted in a pronounced decline in the quality of plaintiff's performance evaluations.

74. During her third and final evaluation under the new system that encompassed the period running from September, 2017 through May, 2019 (the "Final Evaluation"), Ms. Manchester recorded a performance that, while more than satisfactory for many teachers, was not up to the level of plaintiff's prior exemplary evaluations. Thus, of the thirty-three (33) elements on which she was rated, plaintiff received an evaluation of "Exemplary" on only two (2); on the remaining thirty-one (31) elements she received an evaluation of Proficient".

75. Ironically, in the Final Evaluation plaintiff did show improvement in one notable

0028

area: the element entitled "Culturally Proficient Communication". Here, for the first time, her evaluation reflects an actual improvement from the level of "Proficient" to that of "Exemplary", meeting the School-articulated criterion for "Exemplary" performance that reads in part as follows:

> "*Always communicates respectfully with families* and demonstrates understanding and *appreciation of* different families' home language, *culture, and values*." [Emphasis supplied.]

76. As the 2019 school year began, defendants' mismanagement of the library book controversy was becoming increasingly apparent to more and more observers; so too was the animosity of defendants towards Ms. Manchester that had been steadily building for over a year.

77. The ill-will intensified following an incident that occurred in Ms. Manchester's classroom on the afternoon of Friday, September 13, 2019.

78. Ms. Manchester was teaching a class of special education students assisted by Ms. Deborah Lucas, also a Special Ed teacher at the School, when Ms. Lucas noticed a then-eleven (11) year-old boy sitting at his desk fondling his private parts in a highly inappropriate and sexualized manner. Ms. Lucas informed plaintiff, and the two approached the boy. They noticed that he had open on his desk the book *Sex Is A Funny Word*.

79. The provocatively titled book, juxtaposed with the boy's sexualized and highly inappropriate conduct, caused Ms. Manchester to examine the book more closely. When she did, she determined that the book was not only highly inappropriate for middle school children but also highly offensive to many adults. When Ms. Manchester asked the boy how he had obtained the book, the boy replied that defendant Funke had shown him the book and allowed, indeed encouraged, him to check it out of the School library.

80. As a result of this incident, plaintiff sought and obtained a meeting with defendant

21

0029

Monette on the following Monday and showed Monette the book entitled *Sex is a Funny Word*. Upon viewing the book's contents, defendant Monette put her head in her hands and stated: "I don't know what this book is doing in our school." She then proceeded to reprimand Ms. Manchester for implying that the presence of the book was the fault of defendant Monette. Although stating to plaintiff that "I will handle this", defendant Monette did nothing.

81.     As the Fall of 2019 wore on, Ms. Manchester realized that any complaints shared with defendant Monette would be met with an admixture of indifference towards the books and hostility towards herself. As a result, Ms. Manchester decided to take her complaints directly to defendant Gazda. On November 4, 2019, plaintiff prepared and hand-delivered to defendant Gazda a letter (the "November 4 Letter) that recapitulated an earlier conversation plaintiff had had with him in September of 2019 wherein she had expressed her concerns about the sexually explicit nature of the materials being provided to students by defendant Funke. In the November 4 Letter, Ms. Manchester (i) adverted to this earlier conversation, (ii) cited defendant Monette's inertia and irresolution on the subject, (iii) asserted that the offensive materials violated the School's own policy regarding "ideologies and profanity/obscenity", (iv) observed [t]hat there are "many teachers at Baird" who shared her concerns, and (v) requested Ludlow School Committee involvement.

82.     After receiving the November 4 Letter, defendant Gazda scheduled a meeting with plaintiff at the Superintendent's office on the following day (the "November 5 Meeting").[17] At that November 5 meeting, Ms. Manchester reiterated her concerns about the sexually explicit books introduced by defendant Funke and made available to students through the DIRT program,

---

[17]   A meeting that Ms. Manchester had scheduled with defendant Monette for November 6, 2019 to discuss identical concerns was peremptorily cancelled by Monette at the eleventh (11th) hour through Google Calendar, without explanation or discussion.

0030

and informed defendant Gazda of the specific incident in her classroom involving the sixth (6th) grade boy engaging in sexualized activity while reading *Sex is a Funny Word*.

83. Defendant Gazda, for his part, shared some concerns of his own. But these centered not around the presence of objectionable books in the School library but over Ms. Manchester's statements in the November 4 Letter that there were many teachers at Baird who share her concerns, and that the Ludlow School Committee should become involved.

84. The November 5 meeting concluded with defendant Gazda directing Ms. Manchester to ask the other concerned teachers to express their apprehensions in writing and to provide Gazda with specific examples of the materials in circulation at the School library to which those concerns related.

85. Plaintiff did as defendant Gazda directed. Within two (2) weeks following the November 5 Meeting, Ms. Manchester delivered to him a letter dated November 18, 2019 (the "November 18 Letter"), signed by herself and seventeen (17) other teachers at Baird. The November 18 Letter, among other things, (i) recounted, with lurid examples, the history of the library books controversy at the School, (ii) admonished the School administration for doing nothing to enforce the School's policies against the promotion of ideologies, profanity, pornography, and obscenity, and, by implication, failing in its mission to protect the psychological and mental well-being of impressionable children under their charge, and (iii) requested Ludlow School Committee involvement.

86. As a result of the November 18 Letter, defendant Gazda arranged to have Ms. Manchester meet with Ms. Rebecca Bouchard, Esq., the School's Legal Compliance Officer, to discuss the School Committee-approved protocols for reviewing materials in circulation that parents or teachers deemed objectionable. At the meeting, Attorney Bouchard provided Ms.

0031

Manchester with the necessary forms required to initiate the approval process.

87.     A few days later, in an email dated November 27, 2019 addressed to plaintiff and on which the other seventeen (17) teacher/signatories to the November 18, Letter were copied, defendant Gazda declared himself agnostic on whether one of the books that Ms. Manchester and her cohort of teachers had brought to his attention was "appropriate for Middle school". For the rest, Gazda directed Ms. Manchester to fill out the forms that had been provided to her by Attorney Bouchard in order to initiate the preexisting "school committee approval process" that would ultimately determine the suitability of the books and materials that were the subject of the November 18 Letter.

88.     On January 24, 2020, pursuant to the instructions received from defendant Gazda and Attorney Bouchard, Ms. Manchester initiated the School Committee sanctioned approval process of the book *Sex Is A Funny Word* by completing, signing, and delivering to defendant Monette a two (2)-page form entitled "Request for Reconsideration of Instructional Resources" (the "Request for Reconsideration").

89.     As part of the "school committee approved process", defendant Gazda appointed a committee to review the books that were the subject of the Request for Reconsideration submitted by plaintiff. The two (2) teachers appointed to the committee were Michelle Annecchiarico and Michelle Damore, two (2) witnesses personally hostile to plaintiff who would later be named by defendant Funke as potential corroborating witnesses against Ms. Manchester in a discrimination complaint that Funke initiated against her. (*See infra*, ¶¶ 91, 92; Ex. A).

90.     The issue remained controversial enough to be taken up at a meeting of the Ludlow School Committee scheduled for January 28, 2020.

91.     But on January 27, 2020, the day before that meeting, Funke filed a so-called

0032

"Harassment, Bullying, Discrimination, and Hate Crimes Reporting/Complaint" (the "Funke Complaint") against plaintiff on a form approved by the School Committee. The Funke Complaint bore what purports to be Funke's signature but was not executed under the pains and penalties of perjury. A copy of the Funke Complaint is attached hereto as Exhibit A.

92. In the Complaint, Funke charged as follows: "Bonnie Manchester has been spreading lies about me and accusing me of sexually exploiting students … based in part on her perception of my sexual orientation and gender identity…." In addition to Michelle Annecchiarico and Michelle Damore, the Funke Complaint also named defendants Monette and Gazda as corroborating witnesses to Ms. Manchester's alleged misconduct. *Id.*

93. The allegations of the Funke Complaint were without foundation, were not asserted in good faith, and were advanced by defendant Funke in collaboration with defendants Monette and Gazda to bully and intimidate Ms. Manchester because of the latter's outspokenness during the Baird library book controversy and her criticism of defendants' role in instigating, abetting, and ultimately ignoring the crisis once fomented.

94. The Funke Complaint was also designed to retaliate against plaintiff for completing, three (3) days earlier, the Request for Reconsideration, thus triggering School Committee review of books circulated in the School library by defendant Funke. *See supra*, ¶ 88.

95. In addition, the Funke Complaint was timed to "dirty up" plaintiff prior to the Ludlow School Committee meeting of January 28, 2020, at which defendants Gazda, Monette and Funke knew that Ms. Manchester was planning publicly to ventilate her concerns about the offensive books that were the subject of the Request for Reconsideration.

96. But defendants' collusive strategy failed when plaintiff appeared at the January 28 School Committee meeting and, along with a number of parents and teachers, spoke out against

25

0033

the offensive books that defendant Funke had introduced into the School library, and that defendants Gazda and Monette had allowed to remain there.

97. As a result, at the January 28, 2020 meeting the School Committee voted to remove the objectionable books from the Baird library until the Committee could review their contents.

98. Two subsequent meetings of the School Committee were held on February 11, 2020 and March 10, 2020 and at each the controversy of the objectionable books was again addressed. A number of non-parents, including defendant Funke and school librarians from towns other than Ludlow, attended and spoke in favor of retaining the objectionable books in the Baird library. In doing so, they expressed views sharply critical of those who disagreed with them, including Ms. Manchester, parents, and teachers.

99. While the issue of the objectionable books appeared momentarily settled, the matter of the Funke Complaint was not.

100. Following Ms. Manchester's receipt of the Funke Complaint, plaintiff also received a letter dated February 13, 2020 from Erica A. Faginski-Stark ("Faginski-Stark"), Ed.D., Director of Curriculum and Instruction for the Ludlow Public Schools. In her letter, Faginski-Stark stated that she had been designated by defendant Gazda to "address" the Funke Complaint "under the Ludlow Schools' policy on Promoting Civil Rights and Prohibiting Harassment, Bullying, Discrimination, and Hate Crimes". Faginski-Stark went on to explain that she had been asked to assume her role "in lieu of the building principal since [*sic*] she [defendant Monette] has been identified as a witness" in the Funke Complaint. The letter (i) directed Ms. Manchester to meet with Faginski-Stark in her office on February 24, 2020 to "discuss" the Funke Complaint, (ii) advised Ms. Manchester that she could attend with "union representation

26

0034

and/or counsel", and (iii) contained a dire warning against retaliation against persons "who take action consistent with this Policy".

101.    On February 24, 2020, Ms. Manchester met with Faginski-Stark, without "union representation and/or counsel", to discuss the Funke Complaint. At the meeting, plaintiff emphatically denied the allegations of the Funke Complaint and Faginski-Stark adduced no evidence supporting them. The meeting ended without resolution but with Faginski-Stark stating to Ms. Manchester that the investigation into the allegations of the Funke Complaint (the "Funke Investigation") would continue.

102.    Ms. Manchester heard nothing further from anyone regarding the Funke Investigation until she received a three (3)-line email from Faginski-Stark dated March 9, 2020 entitled "Informal Review Update". That email referred to the investigation triggered by the Funke Complaint as "an Informal Review process" and referenced a hitherto undiscussed "Proposed Resolution Agreement". That email also informed Ms. Manchester that "we are still in process relative to a resolution" and concluded by stating that "we hope to have more information by the end of this week".

103.    The March 9, 2020 email from Faginski-Stark is the last communication Ms. Manchester received from any of the defendants relative to the Funke Investigation. In the ensuing three and one-half (3.5)-year period, Ms. Manchester has received no information, much less a written determination, concerning the outcome of the Funke Investigation, despite a requirement set out in the Ludlow Schools' Anti-Discrimination/Anti-Harassment Policy and Grievance Procedure that provides in pertinent part as follows:

> *All good faith efforts* will be made to provide a written determination regarding the complaint and any resolution by the Principal or Civil Rights Coordinator to the complainant and the alleged harasser *within thirty (30) school/working days of the*

0035

*complaint.* [Emphasis supplied.]

104.    Defendant Funke operated in bad faith in bringing the Funke Complaint in the first instance, with the acquiescence, and perhaps collaboration, of defendants Monette and Gazda. The harm to Ms. Manchester was compounded by the fact that the Funke Complaint listed as corroborating witnesses defendants Monette and Gazda, both of whom were not only two (2) of plaintiff's principal antagonists but also her immediate superiors.

105.    Thereafter defendants Gazda, Monette, and Funke, and perhaps others, continued to act in bad faith and punish Ms. Manchester by intentionally dragging out the Funke Investigation and failing to resolve the issues raised by it in a timely fashion, as Ludlow Schools' procedures required. Indeed, the Funke Complaint remains officially unresolved *to this day*.

106.    The Funke Complaint and its non-resolution was part of a larger scheme intentionally pursued by defendants Gazda, Monette, Foley and Funke to marginalize Ms. Manchester in the Baird community and punish plaintiff for her disfavored speech and conduct. By means of the false and malicious allegations of the Funke Complaint, and the purposely unresolved Funke Investigation that ensued, defendants Gazda, Monette and Funke created a cloud of suspicion and ugly innuendo under which plaintiff has been laboring for nearly four (4) years. As a result, Ms. Manchester has had to endure patiently all the emotional distress and professional anxiety that such unjust and maliciously false accusations engender.

C.    **Plaintiff's Medical History**

107.    With the exception of mold and pollen allergies and occasional hypertension, Ms. Manchester had enjoyed generally good health during her first decade at Baird. Her personnel file maintained by the School reflects that during this period, plaintiff was out of work on only two (2) occasions for a total of fifteen (15) days: from February 13, 2006 to February 17, 2006,

28

0036

and from February 23, 2006 through March 8, 2006.

108. On December 28, 2010, an automobile in which Ms. Manchester was riding as a passenger was involved in a motor vehicle accident ("MVA") from which she sustained severe injuries and permanent disabilities that required hospitalization for approximately twelve (12) days. As a result of those injuries plaintiff took a medical leave of absence until late June 2011 when she was cleared to return to work.

109. In the ensuing years Ms. Manchester's work history was punctuated by intermittent medical leaves of absence relating to the MVA, most of which were of only a few days' duration, and most of which permitted her return to work on a part time basis. During this period Ms. Manchester continued to receive superlative evaluations up through the fall of 2019.

110. Following the Funke Complaint in January 2020, the hostile work environment to which Ms. Manchester had been subject became more pronounced, with some of the individual defendants, teachers, and staff exhibiting cold and unfriendly behavior towards her. This atmosphere, combined with the "slow walking" of the Funke Investigation, aggravated plaintiff's already chronic health issues.

111. As a result, in the late winter and early spring of 2020, plaintiff began to experience a number of physical ailments associated with her stressful work environment at Baird, including, without limitation, abdominal and stomach pain. These stress-related symptoms continued up to the date of her termination and beyond.

**D.      Plaintiff's Purportedly "Unbecoming" Conduct**

112. Beginning with the onset of the COVID pandemic in March of 2020, the School shifted to a new teaching paradigm, with teachers and students engaged in virtual classroom

0037

learning.[18]

113.     In the ensuing years, a growing body of data has emerged tending to show that the various forms of remote learning imposed on students (particularly young children), by depriving them of regular in-person interaction with peers - a touchstone of healthy adolescent development - have worked a variety of harm, from diminished academic performance to decline in mental and emotional health.

114.     Six (6) months into the pandemic and its protocols, in the Fall semester of 2020, Ms. Manchester was assigned to teach a sixth (6th) grade class in Ancient History comprised of approximately a dozen students. As with all classes offered by Baird during the pandemic, this class was taught virtually by means of an Internet program called "Google Classroom", whereby each student participated remotely on his own laptop known as a "Google Chromebook".

115.     At that time, many teachers at Baird, including Ms. Manchester, began to observe more and more students exhibiting behavioral and learning issues. These included symptoms of depression, anxiety, withdrawal, inattention or distraction during the remote classes, and "virtual absenteeism" (i.e., students darkening their computer screens during virtual classes). More students than normal seemed to be receiving failing grades, and the increased frequency of students who appeared in various ways to be at risk became a frequent topic of conversation among Baird teachers at staff meetings.

116.     Ms. Manchester, whose expertise in identifying and assisting at-risk students has been previously documented,[19] became particularly concerned about one of the students in her sixth (6th) grade class: the Female Child.

---

[18] Many of the events of this case have been played out against the backdrop of the COVID-19 pandemic, an environment where teachers have been forced to teach, and students to learn, virtually.

[19] As previously noted, even a cursory perusal of Ms. Manchester's personnel file will reveal not only an exemplary record as a teacher but also a particular charism for attracting and healing at-risk children. *See supra*, ¶¶ 29-31.

0038

117.     The Female Child had been a student of plaintiff in years prior to 2020. She had always displayed good work habits and was bright, well-adjusted, academically successful, and personable. By the mid-Fall of 2020, however, Ms. Manchester had become increasingly concerned about the Female Child, who had begun to reflect a depressed demeanor, social detachment, and a marked decline in academic performance characterized by a failure to hand in assignments, poor grades, and a diminished work ethic.

118.     By early December 2020, Ms. Manchester was contemplating notifying the parents of the Female Child about her concerns, even as she had notified the parents of other seemingly at-risk students on numerous prior occasions throughout her teaching career. But before Ms. Manchester could do so, the Female Child "beat plaintiff to the punch". Following a virtual class on December 14, 2020, the Female Child requested a private meeting with Ms. Manchester. The two met via Zoom the following day, Wednesday, December 15, 2020, during plaintiff's regularly scheduled office hours (the "December 15 Meeting").

119.     At the December 15 Meeting, the Female Child informed Ms. Manchester that she was reaching out because she saw in Ms. Manchester a sympathetic and compassionate person in whom she could confide about personal matters at a time when she was in crisis. The Female Child then proceeded to share with Ms. Manchester many of the personal issues that were troubling her. These included, without limitation, the Female Child's poor academic performance under the new COVID protocols, her low self-esteem, poor self-image, depression, and various other personal insecurities and social anxieties.

120.     Towards the end of the December 15 meeting, the Female Child also confided to plaintiff that she had begun to receive unsolicited information concerning LGBTQ+ issues on her Baird Google account "suggestion feed" – a feature the School provided whereby students

31

**0039**

received from YouTube on their Google Chromebooks so-called "you might like" notifications, followed by a selection of videos. The Female Child informed plaintiff that after viewing these materials, she found herself questioning whether she might be attracted to girls as well as to boys, and, in general, went on to describe her confusion over what Ms. Manchester interpreted as "gender identity issues". The Female Child stated to Ms. Manchester: "I know I need help" but "I don't know how to get it". When Ms. Manchester suggested some form of professional counselling in the area of gender identity, the Female Child told plaintiff that she thought "that would be a good idea".

121.    As the December 15 Meeting concluded, the Female Child mentioned to Ms. Manchester that she felt embarrassed speaking to her parents about her possible same sex attraction. As Ms. Manchester enjoyed a preexisting friendship with the parents of the Female Child formed outside of School - the Father works as an auto mechanic and had over the years serviced plaintiff's vehicle - plaintiff offered to serve as an intermediary and to speak to the parents about the gender identity issues troubling the Female Child. The latter readily and gratefully accepted Ms. Manchester's offer.

122.    Before plaintiff could reach out to the parents, she and three (3) other Baird teachers attended a CPT (Common Planning Time) meeting on the following day, December 16, 2020. At that CPT meeting, several at-risk students, were discussed, including the Female Child. At least two (2) of the teachers at that meeting voiced concerns similar to those of plaintiff about what they too had observed in the Female Child: her conspicuous sadness, depressed affect, declining academic performance, and overall poor self-image. All four (4) teachers present at the CPT agreed that the Female Child's parents should be notified of these concerns. It was decided that Ms. Manchester should be the one to approach the parents, in part because of her prior

32

0040

relationship with them, and in part because during plaintiff's December 15 Meeting with the Female Child, the latter had expressly asked Ms. Manchester do so.

123.    As a result, later that day Ms. Manchester initiated a telephone conversation with the mother of the Female Child (the "Mother") and conveyed her own and some of the other Baird teachers' concerns about the Female Child's depression and overall mental and emotional health. Ms. Manchester also informed the Mother about the Female Child's confusion over her gender identity as disclosed to plaintiff by the Female Child at the December 15 Meeting. In that telephone call, the Mother expressed her gratitude to Ms. Manchester for the valuable line of communication that had been established, shared with plaintiff certain deeply personal information about herself as well as the Female Child, and indicated that as a result of her conversation with Ms. Manchester, the Mother would try to obtain counseling for her daughter with a professional whom Ms. Manchester had recommended. After the call, Ms. Manchester memorialized the call with the Mother on a spreadsheet designed to track communications with parents and maintained by the School's Mariners Team.

124.    On December 21, 2020 the Mother composed and transmitted an email (the "December 21 Email") to several of the School's teachers and staff, including defendants Gazda and Monette. In the December 21 Email, the Mother informed the recipients of the parents' desire to address the Female Child's gender identity questions and other mental health issues as a family and with professional help. The Mother requested that the recipients not have private conversations with the Female Child regarding these matters. The full text of the December 21 Email reads as follows:

"Good evening,

0041

I am writing in regards to my daughter [name redacted]. It has been brought to the attention of both Stephen [the Female Child's father] and myself that some of [the Female Child's] teachers are concerned with her mental health.

I appreciate your concern and would like to let you know that her father and I will be getting her the professional help she needs at this time… With that being said, *we request that you do not have any private conversations with [the Female Child] in regards to this matter*. Please allow us to address this as a family and with the proper professionals." [Emphasis supplied.]

Thank you in advance with [*sic*] your concern to this matter.

Sincerely,

[Name of Mother redacted]" [Emphasis supplied.]

125. To date, the Mother has yet to receive a reply to the December 21 Email either from the School or from any of the recipients to whom it was addressed and distributed.

126. Also on December 21, the Mother telephoned Ms. Manchester to ask whether the latter would be willing to work after school hours with the Female Child on activities, creative projects, and to provide extra help with coursework in order to keep the Female Child occupied and engaged until counselling began in late January. Ms. Manchester readily agreed to do so.

127. Accordingly, beginning on January 4, 2021 and continuing through January 27, 2021, the Female Child met regularly, remotely, and privately after school with Ms. Manchester via Google Meeting. In addition to serving as a mentor and tutor, Ms. Manchester collaborated with the Female Child on a variety of creative projects, including: the design and construction of a plant hanger, macrame, chia pets, and vision boards.

128. Throughout this period, at the request of both the Female Child and her parents, Ms. Manchester was in regular contact with the latter in order to apprise them of all aspects of their daughter's mental and emotional condition - including those pertaining to gender identity -

34

0042

and to keep them abreast of the improvement the Female Child was demonstrating in all areas as a result of the Female Child's extracurricular interactions with plaintiff. At all times the Female Child was aware of and approved Ms. Manchester's frequent communication with her parents. As regards the Female Child's questioning of her gender identity, at no time did Ms. Manchester detect any hostility or coercion towards the Female Child from the parents on account of this issue. To the contrary, in all her dealings with the Female Child's parents, plaintiff found them to be loving, compassionate, and supportive of their daughter as she worked her way through these questions pertaining to gender-related identity. Ms. Manchester certainly never considered the Female Child's home environment to be unsafe.

129. But Ms. Manchester was not the only one in frequent communication with the Female Child during this period. Despite the parental requests made in the December 21 Email, and notwithstanding the fact that defendants had few, if any, professional qualifications in the area of child psychiatry and child development, during the winter and spring of 2021 defendants and their agents, especially defendant Foley, were in regular contact with the Female Child regarding the latter's struggles with gender identity. But neither defendant Foley, nor any of the other defendants, ever disclosed this fact to the Female Child's parents. *Cf.*, ¶¶ 41-43.

130. On Sunday afternoon, February 28, 2021, the Female Child transmitted an email (the "Female Child Email") to over a dozen School staff, including plaintiff and defendant Foley, the School's Grade Six School Counselor, announcing, *inter alia*, that she was "genderqueer". The full text of that Female Child Email, purportedly authored by an eleven (11) year-old without adult prompting or guidance, reads as follows:

> "Hello everyone,
> If you are reading this you are either my teacher or guidance
> counselor. I have an announcement to make and I trust you guys
> with this information, [*sic*] I am genderqueer. Basically, it means I

0043

use any pronouns (other than it/its). This also means I have a name
change. My new name will be R, [*sic*] please call me by that name.
If you deadname me or use any pronouns I am not comfortable
with I will politely tell you. I am telling you this because I feel like
I can trust you. A list of pronouns you can use are [*sic*]: she/her
he/him they/them fae/fear ae/aer ve/ver xe/xem ze/zir. I have added
a link so you can look at how to say them, [*sic*] please only use the
ones I have listed and no other ones. I do not like them.
Thank you for your time.
R [last name omitted]"

131.     The Female Child Email does not characterize either its existence or its various

disclosures as confidential – including the disclosure that the Female Child is "genderqueer". Nor

does it instruct the numerous recipients not to share its contents with others, much less with the

Female Child's parents.

132.     The next morning, Monday, March 1, 2021, Foley met alone with the Female

Child, in apparent violation of the parents' requests made to the School in the December 21

Email. *See supra,* ¶ 124. Foley then transmitted an email to the Female Child (the "Foley

Email") on which eight (8) other teachers at Baird, including Ms. Manchester, were copied. The

full text of the Foley Email, setting forth a protocol embraced by all defendants, reads as follows:

> "Thank you [name redacted] for sharing such an important piece of
> yourself with us.
>
> I'm going to share with your teachers what we had talked about
> today.
>
> [Name redacted] is open to the long list of pronouns that she
> provided but she PREFERS He/They. He understands that there
> will be times that she/her slips out and he is fine with that.
>
> [Name redacted] is still in the process of telling his parents and is
> requesting that school staff refer to him as [name redacted]  and
> use she/her pronouns with her parents and in written emails/letters
> home. When [name redacted] has informed his parents of his
> preferred name and pronouns, we will change the name in the
> computer system if that is what he wishes to do at that time.

0044

I explained to him that we understand this is a complicated process and we will be as supportive as possible - but may make mistakes from time to time.

Thank you all, Baird is an amazing place to be.

Marie Foley"

133.     As with the Female Child Email, addressed and transmitted to no fewer than a dozen Baird teachers, the Foley Email did not expressly characterize as "confidential" any of the information that it disseminated to the eight (8) teachers to whom it was addressed. Nor did the Foley Email set forth any prohibitions on its further dissemination to third parties, much less to the parents of the Female Child. Further, the Foley Email did not reference any School Committee-sanctioned policy, Baird, or Ludlow Schools rule, regulation, policy, or guideline that might inform, much less prohibit, further dissemination.[20]

134.     What the Foley Email *did* do was set in motion a dishonest and corrupting scheme concocted by defendants (and previously deployed by them in similar circumstances involving other Baird students – *see infra,* ¶ 135) whereby an eleven (11) year-old Female Child, together with members of the Baird staff, actively colluded in a duplicitous charade designed to conceal from the Mother and the Father, but to reveal to everyone else, something of great importance regarding their Female Child, to wit: the perilous, gender-questioning odyssey upon which that child was purportedly embarked.

135.     Put another way, the Foley Email, implicitly countenanced by all defendants, prescribed both to the eleven (11) year-old Female Child and to the adult recipients a deceitful

---

[20] On the record compiled to date, no such School, Ludlow Schools, or School Committee-sanctioned rule, regulation, policy, or guideline, written or oral, then existed, nor, on information and belief, does one exist as of the date of this Amended Complaint. But in any event, if such a prohibition existed, then it was insufficiently promulgated by defendants as Ms. Manchester received no notice of such a policy.

0045

double life: all were to present the Female Child as a female student to her parents, but as a male student to the rest of the Baird community.

136.    This conduct of defendants was far worse than a mere failure to inform. It was far worse than a mere failure to live up Baird's own lofty Standards of parent-teacher communication enshrined in the School's biennial performance evaluations for teachers: (i) to "[s]uccessfully engage most families and sustain their active and appropriate participation", *see supra,* ¶ 41; to (ii) "[r]egularly use two-way communication with families about student performance and learning", *see supra,* ¶ 42; and (iii) "[a]lways [to] communicate respectfully with families and demonstrate understanding of and *sensitivity to* different families' home language, *culture, and values." See supra,* ¶ 43. [Emphasis supplied.] The conduct of defendants was an outrageous manifestation of hubris and deception that obscured from parents risks to their children's mental, physical, and emotional health unjustified by any governmental interest. As such, defendants' conduct shocks the conscience of every sentient parent and citizen.

137.    The Foley Email was not the only attempt by defendants to hide information from parents about a matter of importance regarding their child. A short time after the Foley Email was transmitted, defendant Foley, addressing the case of a *second* female student at Baird experiencing gender identity issues, sent a similar email to School staff that read as follows:

> "Hi all,
>
> [Female birth name] has a preferred name of Michael/Mike and preferred pronouns of he and his. He understands that there will be times that "[female birth name]" and "she/her" slips out and he is fine with that.
>
> *Michael is still in the process of telling his parents and is requesting that school staff refer to him as [*female birth name*] and use she/her pronouns with her [sic] parents and in written emails/letters home.* When Michael has informed his parents of his

38

preferred name and pronouns, we will change the name in the computer system if that is what he wishes to do at that time."

I explained to him that we understand this is a complicated process and we will be as supportive as possible – but may make mistakes from time to time.

Thanks,

Marie" [Emphasis supplied.]

138. The dishonest activities of defendants traduced a principal canon of transgender counseling and one of the critical touchstones of trans liberation: "Own who you are." Worse, in pursuing their duplicitous strategy, defendants, who should be setting an example of honesty and integrity for their student charges, did precisely the opposite. Worst of all, defendants struck at the sacred covenant between parents and their children.

139. Two (2) days following the Foley Email, on Wednesday, March 3, 2021, Ms. Manchester and eight (8) other teachers at Baird constituting the School's Mariners Team attended another CPT meeting. At that meeting, the Female Child Email was apparently discussed, although plaintiff was not present for those discussions, having left the meeting early to attend a doctor's appointment. During the portion of the CPT meeting when Ms. Manchester was present, she recalls no discussion among the other attendees concerning the confidentiality of the Female Child Email or whether the Female Child's parents should or should not be notified of its contents.

140. Baird had always encouraged communications between teachers, students, and their families; indeed, since 2013 the School had made communication with parents and families an important criterion of the teacher's biennial performance evaluations. *See supra,* ¶¶ 42, 43. But the School had never promulgated policies, guidelines, or instructions, written or otherwise,

0047

governing teacher communications with parents, much less prohibitions regarding parent-teacher communications. Further, at all relevant times, no official Ludlow Schools or Baird policy existed that addressed the use of student's preferred names or preferred pronouns when different from students' enrolled name or birth pronouns.

141. Several days following the CPT meeting of March 3, 2021, Ms. Manchester by chance encountered the Father after school while dropping off her automobile for repairs at the garage where the latter was employed and a conversation between the two ensued.

142. After some initial pleasantries, the Father brought up the subject of the older brother of the Female Child, whom Ms. Manchester had taught the year before and whom she also considered to be at risk. The Father confided to plaintiff that he had recently noticed on his son's Google Chromebook an email he found disturbing, purportedly authored by the son (the "Son's Email"), in which the son expressed doubts about his own gender identity.

143. Ms. Manchester, speaking as a private citizen to one with whom she had formed a preexisting friendship outside of School, discussed with the Father the phenomenon of gender dysphoria (*see* footnote 28) then prevalent among certain teens, particularly since the onset of COVID. Ms. Manchester also discussed with the Father efforts then underway by certain teachers and administrators at Baird to assist LGBTQ students in "regendering", to protect them from bullying and other forms of harassment, and to conceal information from parents, and how all this was a matter of great public concern and controversy among teachers, parents, administers, and School Committee members, not only in Ludlow but also nationwide.

144. The conversation then turned to the Female Child, her performance in school, her overall well-being, and the progress she was making in professional counselling. Struck by the similarities of voice and language between Son's Email and the Female Child Email, plaintiff

0048

asked the Father whether he was aware of the recently-transmitted Female Child Email. When the Father replied in the negative, plaintiff shared with him the gist of the Female Child Email, as well as plaintiff's suspicion that someone other than the Female Child and the son had written both emails.

145. Sometime later, the parents of the Female Child contacted defendant Monette to request a meeting, upset not only by the contents of the Son's Email and the Female Child Email, but also by the fact that several of the defendants had violated the parents' request, contained in their December 21 Email, not to have private conversations with the Female Child in order that the issues she was facing could be addressed exclusively by the family and appropriate professionals.

146. After some delay, a meeting between the parents and defendant Monette was at last scheduled for March 16, 2021. But before that meeting could occur, a meeting between the Female Child and defendant Foley took place on March 15, 2021, during which the Female Child informed Foley that Ms. Manchester had not only informed the Father of the existence of the Female Child Email but had shared with him plaintiff's suspicion that both it and the Son's Email had been authored by someone other than his two children. Defendant Foley promptly informed defendant Monette of these developments, who in turn informed defendant Gazda.

147. Defendant Gazda's response was to direct defendant Monette and Attorney Bouchard to conduct an investigation to determine how so-called "confidential information" (*i.e.,* the Female Child Email that had been disseminated to over a dozen adults and an as-yet undetermined number of students), came to be disclosed to the parents of the Female Child, purportedly against the "express" wishes of the Female Child.

**E. Defendants' Retaliation Against Plaintiff and Plaintiff's Termination**

0049

148. For a period of two (2) weeks Ms. Manchester heard nothing from the School concerning the Female Child, nor was she expecting to. Then, on Friday, March 19, 2021, following the end of the school day, plaintiff received without warning a letter from defendant Monette delivered electronically (the "March 19 Letter") notifying Ms. Manchester that she was being placed on paid administrative leave "effective immediately for conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." A copy of the March 19 Letter is attached hereto as Exhibit B.

149. In the March 19 Letter, defendant Monette failed to specify what parental communications defendants deemed "inappropriate". Further, the March 19 Letter failed to cite a single statute, regulation, School rule, regulation, protocol, or policy that Ms. Manchester was to have traduced. Although the March 19 Letter referred only to possible future disciplinary action following investigation, simultaneously with its transmission defendants blocked plaintiff's access to her School email and other records, both electronic and hard copy.

150. At the time Ms. Manchester received the March 19 Letter, the investigation ordered by defendant Gazda had not yet begun, nor had anyone connected with the School sought Ms. Manchester's side of the story regarding her allegedly "inappropriate communications with the parents of a student" that purportedly rose to the level of "conduct unbecoming a teacher".

151. On March 23, 2021, four (4) days after plaintiff was placed on administrative leave, defendant Monette and Attorney Bouchard interviewed all but one of the Baird staff members who constituted the Mariners Team.[21] The only one not interviewed was Ms. Manchester. All interviewed denied having any communication whatsoever with the parents of

---

[21] The Mariners Team included plaintiff and eight (8) other Baird teachers and staff.

0050

the Female Child,[22] much less communications concerning the Female Child or Foley Emails.

152. Two days later, on March 25, 2021, plaintiff, represented by her then counsel, was interviewed via Zoom by defendant Monette and Attorney Bouchard (the "March 25 Interview"). Although blindsided by the March 19 Letter and denied access by the School to all her records, plaintiff answered completely and in good faith every question posed to her by Attorney Bouchard and defendant Monette.

153. Following the March 25 Interview, defendant Monette, apparently needing more, sent a second letter to plaintiff dated April 6, 2021 (the "April 6 Letter"), on which defendant Gazda was copied, requesting that Ms. Manchester make herself available on short notice for a *second* interview two (2) days later, on April 8, 2021.

154. The April 6 Letter reiterated that the requested second interview was "regarding an investigation into conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." A copy of the April 6 Letter is attached hereto as Exhibit C.

155. The requested interview was ultimately held on April 14 (the "April 14 Interview) and again conducted virtually, with defendant Monette, Russell J. Dupere, Esq., counsel for the Ludlow Schools, plaintiff, and plaintiff's successor counsel participating.

156. Despite the fact that defendants characterized both the March 25 Interview and the April 14 Interview as "investigative", requests by Ms. Manchester and her counsel that Baird provide plaintiff with (i) more detailed information concerning the scope of the School's investigation, (ii) the nature of plaintiff's allegedly "inappropriate" conduct, and (iii) access to her files and School computer so that she might better prepare for the interviews rendering them

---

[22] In her interview, defendant Foley actually denied ever having received the parents' December 21 Email. *See* ¶ 124.

0051

more fruitful, were all denied by defendants.

157. As she had done in the March 25 Interview, so too in the April 14 Interview: Ms. Manchester answered completely and in good faith every question posed to her. Unfortunately, defendants did not reciprocate Ms. Manchester's good faith.

158. Instead of a collaborative search for truth, the April 14 Interview devolved into a hostile, hour-long inquisition by Attorney Dupere, who posed to a witness relying entirely on memory (because denied access to her records) a series of inexpertly framed and confusing questions, designed less to uncover the truth than to confound Ms. Manchester, place her on the defensive, and trip her up on small details.

159. The strategy of defendants was obvious. Aware that the vague and subjective standard upon which they had theretofore relied - "conduct unbecoming of [*sic*] a teacher" based upon "inappropriate communications with the parents of a student" (*see* Ex. B, C and D) - was legally and factually absurd, defendants needed to conjure up additional, synthetic grounds upon which the termination of a teacher with disfavored views but an exemplary record might be justified.

160. One technique employed by Attorney Dupere to accomplish this objective was to blur the distinction between the Female Child Email and the Foley Email in his questioning of Ms. Manchester. Where Attorney Bouchard's questioning of Ms. Manchester in the March 25 Interview had focused entirely upon the Foley Email, ignoring the Femail Child Email, Attorney Dupere's interrogation in the April 14 Interview conflated the two by posing undifferentiated questions to Ms. Manchester that referred to both simply as "the email"; thus Attorney Dupere's questions about the one were answered by Ms. Manchester with reference to the other, like skew lines passing in space. The result was a sloppy, ambiguous, and imprecise interrogation that

44

0052

yielded a sloppy, ambiguous, and imprecise transcript.

161. Yet so desperate were defendants to shore up their position that they immediately seized upon the murky transcript of the April 14 Interview as yielding evidence of untruthfulness, citing that as additional and sufficient grounds for terminating Ms. Manchester. *See* Ex. D. Were the FBI to deploy such a disingenuous and ham-handed stratagem in the course of an interview during a criminal case, it would be seen by any fair observer for what it is: a made-up process crime or "perjury trap", more indicative of the bad faith of the examiner than the mendacity of the examined.

162. Following the April 14 Interview, a full seven (7) weeks passed before Ms. Manchester received any communication from defendants. Then, in a letter to her dated May 19, 2021 (the "May 19 Letter) that cited an unwritten and previously unarticulated (much less enforced) policy that purportedly prohibits teachers from communicating to the parents of their students about any matter relating to their children's gender identity, defendant Monette, informed Ms. Manchester that "I have decided to terminate your employment with the Ludlow Public Schools due to [*sic*] conduct unbecoming of [*sic*] a teacher." A copy of the May 19 Letter is attached hereto as Exhibit D.

163. The May 19 Letter asserted three (3) specific grounds for termination:

First, that Ms. Manchester had shared "sensitive confidential information about a student's expressed gender identity against the wishes of the student, the direction of the Guidance Counselor, and in contradiction to DESE guidance";[23]

---

[23] Following enactment of An Act Relative to Gender Identity (Chapter 199 of the Acts of 2011), that became effective on July 1, 2012 and amended several Massachusetts statutes to prohibit discrimination on the basis of specified categories, including gender identity, the Department of Elementary and Secondary Education of the Commonweealth of Massachusetts ("DESE") promulgated guidance entitled "Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment" (the so-called "DESE guidance") to assist schools in

0053

Second, that she had been "untruthful numerous times during the investigation of this matter"; and

Third, that plaintiff had "violated state law and regulations regard [*sic*] student records/privacy as well as the Family Educational Rights and Privacy Act (FERPA)". *Id.*

164.    Ms. Manchester had not "shared sensitive information about a student's expressed gender identity against the wishes of the then eleven (11) year-old student". To the contrary, plaintiff had shared that information with the Female Child's parents at the express request and with the permission of the student/Female Child, permission that the Female Child to this day has never revoked. But even without the Female Child's permission, plaintiff's conduct still would not have constituted valid grounds for her termination.

165.    Nor had Ms. Manchester "shared sensitive information" against "the direction of the Guidance Counselor", defendant Foley. As in the case of the School, Foley had promulgated no such direction, instructions, or guidance, written or oral; even if she had, Ms. Manchester would not be bound by such a direction. But even then, disregard of such a "direction" in the circumstances of this case would hardly amount to "conduct unbecoming a teacher".

166.    In addition, far from being "in contradiction to DESE guidance" as defendants asserted, Ms. Manchester's sharing with the then eleven (11) year-old Female Child's parents "sensitive confidential information about a student's [the Female Child's] expressed gender identity" was in fact entirely *consistent* with the DESE guidance. It was actually defendants, by their deceitful strategy of keeping parents in the dark about their children's gender dysphoria (embarrassingly laid bare in the Foley Email), who were "in contradiction to DESE guidance" that, at all relevant times read in pertinent part as follows:

---

implementing the gender identity provisions of the new Act. The DESE guidance is accessible through the following link: https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.

0054

"The responsibility for determining a student's gender identity rests with the student *or, in the case of young students not yet able to advocate for themselves, with the parent.*"[24]

\*\*\*

When determining which, if any, staff or students should be informed that a student's gender identity is different from the assigned birth sex, decisions should be made in consultation with the student, *or in the case of a young student, the student's parent or guardian.*[25] [Emphasis supplied.]

167.     While the DESE guidance provides no definition of the term "young student", the age of fourteen (14) supplies the line of demarcation in the DESE guidance for determining when absolute parental authority yields to that of the student for purposes of consenting to the disclosure of student record information:[26]

"Transgender and gender nonconforming students may decide to discuss and express their gender identity openly and may decide when, with whom, and how much to share private information. A student who is 14 years of age or older, or who has entered the ninth grade, may consent to disclosure of information from his or her student record. *If a student is under 14 and is not yet in the ninth grade, the student's parent (alone) has the authority to decide on disclosures and other student record matters.*" [Emphasis supplied.]

168.     Leaving aside the fact that it takes a grim self-transcendence for those who have colluded to deceive parents and conscripted (and thereby corrupted) young students to participate in their deception to accuse anyone of being "untruthful numerous times during the investigation

---

[24] *See* DESE guidance, p. 2, accessible at https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.
[25] *Id.*, p. 4.
[26] Under Massachusetts law (*see* 603 CMR 23.00), a student's record includes information about a student's birth name, name change for gender identity purposes, gender transition, medical or mental health treatment related to gender identity, and otyher ionformation of a similar nature. *See also*, DESE guidance, p. 4, accessible at https://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html.

0055

of this matter" (*see* Ex. D), Ms. Manchester was not untruthful. She cooperated fully with the School during its investigation, voluntarily making herself available for questioning by defendant Monette and School counsel on two separate occasions, despite the stress and inconvenience entailed. Further, during the March 25 Interview and the April 14, Interview, Ms. Manchester was forthright and forthcoming, answering to the best of her memory and ability *all* questions posed to her without resort to obfuscation, memory lapses, or other stratagems of evasion. Further still, plaintiff's cooperation and good faith continued, even after asking for, and being refused, access to her School records in order to refresh her recollection of events, sharpen her testimony, and make the School's investigation more fruitful.

169. Lastly, plaintiff violated no state or federal laws or regulations regarding privacy of student records, and defendants' false assertion that she released "student information to individuals who did not have the right to view the information" is without legal or factual foundation.

170. When reduced to its essence, the position of defendants rests upon the following absurd proposition: Ms. Manchester must be (and was) given not an intermediate sanction but the ultimate punishment - termination - for exercising core speech protected by the First Amendment, off School grounds, after School hours, and not in the course of her employment as a teacher with the Father of an at-risk eleven (11) year-old Female Child as part of a preexisting dialogue with the parents initiated at the request of that Female Child.

171. The absurdity becomes more striking considering that: (i) Ms. Manchester had enjoyed a preexisting years-long, personal friendship with the parents; (ii) Ms. Manchester had formed a preexisting, months-long rapport with the Female Child in which the latter had confided in Ms. Manchester about a host of personal issues with which she had been wrestling,

48

0056

including gender dysphoria; (iii) Ms. Manchester's Female Child-initiated dialogue with the parents had been the impetus for the parents seeking professional counseling for the Female Child that might have been lifesaving; (iv) the freedoms of association and speech exercised by Ms. Manchester in her friend-to-friend conversation with the Father did not affect in any way the operations of the School or impair its ability to operate efficiently and effectively; (v) neither the parents nor the Female Child ever voiced a complaint about the conduct of Ms. Manchester [27] who continues to have the complete and enthusiastic support of both parents and the Female Child; and (vi) nothing in the record compiled to date suggests the sort of parental dysfunctionality that would result in harm to the Female Child as a result of plaintiff's conduct.

172.    Ms. Manchester believes that teachers have a duty and a responsibility to inform parents of issues that could affect their children's mental, emotional, and spiritual wellbeing, including, without limitation, issues relating to gender identity.

173.    Plaintiff also believes that for a teacher to assist an eleven (11) year-old student in deceiving that child's parents would constitute not only a grave moral wrong but also provide a harmful and immoral example to that student.

## V.  CLAIMS FOR RELIEF

### COUNT I

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Defendants Gazda, Monette, Foley, and Funke)

---

[27] To the contrary, it was the at-risk Female Child who initially approached Ms. Manchester in December of 2020 seeking the latter's assistance in communicating with her parents, not the other way round. *See* ¶ 121. As for the parents themselves, in a letter to Principal Monette dated May 5, 2021 they lauded Ms. Manchester for providing them the information about their eleven (11) year-old daughter that was the alleged basis for plaintiff's termination by the School.

0057

174. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 173 of this Complaint as if fully set forth herein.

175. At all relevant times, defendants Gazda, Monette, Foley and Funke knew that plaintiff suffered from a disability.

176. Even had plaintiff not suffered from a disability, or even if she had and defendants Gazda, Monette, Foley and Funke had not known it, the conduct of defendants was extreme and outrageous.

177. Defendants Gazda, Monette, Foley and Funke intended to inflict emotional distress on plaintiff, or they knew or should have known that the foreseeable result of their actions or their failures to act would be the infliction of severe emotional harm on plaintiff.

178. Given that plaintiff did suffer from a disability, the conduct of defendants Gazda, Monette, Foley and Funke was beyond all possible bounds of decency and utterly intolerable in a civilized community.

179. The conduct of defendants Gazda, Monette, Foley and Funke caused plaintiff to suffer emotional distress. The emotional distress of plaintiff was severe and of a nature that no reasonable person could be expected to endure it and plaintiff was unable to endure it.

180. The conduct of defendants' Gazda, Monette, Foley and Funke has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT II

## CIVIL CONSPIRACY

50

0058

**(Defendants Gazda, Monette, Foley, and Funke)**

181. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 180 of this Complaint as if fully set forth herein.

182. Defendant Funke's introduction of sexualized and age-inappropriate books, media and other materials into the Baird library had created an upsurge of tension and controversy within the Baird community sweeping into its vortex not only teachers and School administrators but also parents and School Board members. *See supra,* ¶ 52 *et seq.*

183. The crescendo reached a climax in the Spring of 2017 when plaintiff discovered that defendant Funke had provided students in plaintiff's sixth (6th) grade Ancient History class with inappropriate animated videos depicting sexual activity that was explicit, aberrant, and grossly inappropriate for children of that age. *See supra,* ¶¶ 65, 66.

184. Alerted by that incident to the serious problem of sexualized and age-inappropriate books and media being introduced into the Baird School library, plaintiff from that point forward began playing a leading role on behalf of parents and fellow teachers at Baird in demanding that defendants take steps to remove the objectionable material. *See supra,* ¶¶ 65 *et seq.*

185. Among other activities, plaintiff not only spoke out boldly and repeatedly against the offensive materials, but also strove tirelessly to hold defendants accountable for their reluctance, refusal, and inability to demonstrate leadership on this issue, to the point where, by the Fall of 2019, defendants Gazda, Monette, Foley, Funke and others saw plaintiff not only as a "hair shirt" but as a dangerous adversary who must be neutralized because of the "waves" she was making among parents, other teachers, members of the School staff, and, most frightening to defendants, members of the School Committee.

0059

186. As a result, the many "ganged up" against the one. Defendants Gazda, Monette, Foley, and Funke, in combination, put in motion a series of concerted actions by illegal means, overt and covert, for the unlawful purposes of marginalizing and diminishing plaintiff's personal and professional standing and reputation in the Baird community, and ultimately terminating her employment with the School.

187. The conspiracy against plaintiff included, without limitation, the following overt acts: (i) the generation of a dishonest, inaccurate, and unjust Final Evaluation covering plaintiff's performance during the period from 2017-2019 (*see supra,* ¶¶ 74, 75); (ii) instigating the preparation of the spurious Funke Complaint in January of 2020 (*see supra,* ¶¶ 91-95) that names defendants Monette and Gazda as witnesses and whose allegations, knowingly false when made, remain unresolved over four (4) years after they were asserted; (iii) orchestrating the termination of plaintiff from her position as a teacher in the Ludlow School Ludlow Schools based on the arbitrary, capricious, and theretofore unarticulated standard of "conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." (*see supra,* ¶¶ 138-160); (iv) after placing plaintiff on administrative leave, denying her access to her School files and records while attempting to lure plaintiff into making false and inaccurate statements during the March 25 and April 14 Interviews (*see supra,* ¶¶ 148-154); and (v) once they had been maliciously and synthetically generated, citing the knowingly false allegations of "untruthfulness" as separate grounds for plaintiff's termination. *See supra,* ¶¶ 160-167 and Ex. D.

188. Each defendant engaged in the particular tortious activity knew that the conduct of the other defendants involved constituted a breach of duty, and each gave substantial assistance or encouragement to the others so to conduct themselves.

0060

189. The conspiracy of defendants Gazda, Monette, Foley, and Funke against plaintiff resulted in plaintiff's termination from her twenty (20)-plus years position as an exemplary teacher in the Ludlow School Ludlow Schools, and caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT III

**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT**
**OF**
**FREEDOM OF SPEECH**

**CONTENT AND VIEWPOINT DISCRIMINATION**

**(Defendants Gazda, Monette, and Ludlow)**

**(42 U.S.C. § 1983)**

190. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 189 of this Complaint as if fully set forth herein.

191. As public employers and/or supervisors of Ms. Manchester, defendants Gazda, Monette, and Ludlow had a duty to respect her rights as a public employee to free speech and association under the First Amendment to the United States Constitution.

192. The conversation Ms. Manchester had with the Father of the Female Child that formed the basis of her termination (*see supra,* ¶¶ 139-141), occurred off School property, after School hours, and was a continuation of conversations already begun outside official School channels with the parents of the Female Child at the Female Child's request. *See supra,* ¶¶ 121-

53

0061

123. In that conversation, Ms. Manchester spoke not in the course of her official duties as a teacher but as a citizen and friend.

193. Ms. Manchester's conversation with the Father of the Female Child that formed the basis of her termination was on matters of public concern that included, without limitation: (i) the phenomenon of gender dysphoria[28] among teenagers; (ii) the highly questionable protocols observed by the School in dealing with that issue, and (iii) not only the withholding from parents of information critical to their children's mental and emotional wellbeing but also a program of conscious deception of those parents.

194. Defendants Gazda and Monette considered the content and viewpoint of plaintiff's expression when, making it up as they went along, they decided arbitrarily and capriciously to implement and enforce an unwritten, unarticulated, and theretofore unpromulgated School protocol prohibiting private communications between teachers and parents on a matter of grave public concern.

195. By terminating plaintiff "due to conduct unbecoming of [*sic*] a teacher" (*see* Ex. D), defendants Gazda and Monette have engaged in content or viewpoint (or both) discrimination, and have punished plaintiff for engaging in the kind of core expression and association that the First Amendment protects.

---

[28] "Gender dysphoria" refers to the psychological distress frequently associated with a mismatch between a person's biological sex and his or her self-perceived or desired gender identity. It is a serious condition that typically requires treatment and support from mental health professionals. Whether children with gender dysphoria should socially transition to living under a different gender identity is a question that divides mental health professionals, many of whom believe that children should *not* socially transition early because transitioning may cause an artificial solidification and retention of a transgender identity in circumstances where the dysphoria might resolve itself naturally with age.

0062

196. Defendants Gazda and Monette, implicitly or explicitly, threatened to do so to other teachers and administrators at Baird who expressed similar views.

197. The interests of plaintiff (to say nothing of the interests of the Female Child and her parents) in having the parent-teacher communication at issue in this case outweighs any interests defendants might assert in prohibiting such communications, even if, as was not the case here, the conduct of defendants in retroactively prohibiting the communication had conformed to the wishes of the student.

198. Plaintiff's exercise of her rights of freedom of speech and association never prevented defendants from efficiently providing services to the public or to the Female Child, nor did it threaten to do so, nor did it affect in any way the operations of the School or impair the ability of the School or the Ludlow Schools to operate efficiently and effectively.

199. The conduct of defendants Gazda and Monette would have a chilling effect on other School employees in the exercise of their constitutionally protected rights of freedom of expression and association, and would deter a person of ordinary firmness from exercising those rights in the future.

200. The conduct of defendants Gazda and Monette has violated plaintiff's rights of freedom of speech and association as guaranteed by the First Amendment to the United States Constitution and has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

<u>**COUNT IV**</u>

0063

**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS**
**OF**
**FREEDOM OF SPEECH AND ASSOCIATION**

**RETALIATION**

**(Defendants Gazda, Monette, and Ludlow)**

**(42 U.S.C. 1983)**

201. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 200 of this Complaint as if fully set forth herein.

202. As a public employer and/or supervisor, defendants Gazda, Monette, and Ludlow had a duty under the First Amendment to the United States Constitution to respect plaintiff's rights as a public employee to free speech and association.

203. The conversation Ms. Manchester had with the Father of the Female Child that triggered her termination (see supra, ¶¶ 139-141) occurred not in the course of plaintiff's official duties as a teacher but in her role as a citizen, involved matters of public concern, and was constitutionally protected.

204. By threatening to punish Ms. Manchester for engaging outside the classroom in protected speech, and then ultimately punishing her by terminating her employment, defendants Gazda, Monette, and Ludlow retaliated against plaintiff and continue to retaliate against her for exercising her rights under the First Amendment.

205. Plaintiff's statements made to the Father as a citizen on matters of public concern touching upon the wellbeing of his Female Child never prevented defendants from efficiently providing services to the public or to the Female Child, nor did it threaten to do so, nor did it affect in any way the operations of the School or impair the ability of the School or the Ludlow

56

0064

Schools to operate efficiently and effectively. As such, plaintiff's speech was protected by the First Amendment and insulated from employer discipline.

206. Defendants Gazda and Monette considered the content and viewpoint of plaintiff's expression when they decided to place her on administrative leave and, later, to terminate her. By doing so, defendants chilled, and continue to chill, the First Amendment rights of similarly situated teachers who express views disfavored by defendants.

207. The conduct of defendants Gazda and Monette has violated plaintiff's rights of freedom of speech and association guaranteed by the First Amendment to the United States Constitution and has caused plaintiff to suffer damages including, without limitation, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## COUNT V

### VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT

**(Defendants Gazda, Monette, Foley, and Funke)**

**(Violation of Mass. Gen. L. Ch. 12, §§ 11I)**

208. Plaintiffs realleges each of the allegations set forth in paragraphs 1 through 207 of this Complaint as if fully set forth herein.

209. The Massachusetts Civil Rights Act authorizes a private plaintiff to seek compensatory damages and injunctive relief against anyone who interferes with the plaintiff's exercise of constitutional rights. The statute provides a cause of action as follows:

57

0065

> [w]henever any person or persons, whether or not acting under color of law, interferes by threats intimidation or coercion, or attempts to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass. Gen. Laws ch. 12, §§ 11H, 11I). To establish a claim under the act, "a plaintiff must prove that (i) the exercise or enjoyment of some constitutional or statutory right; (ii) has been interfered with or attempted to be interfered with; and (iii) such interference was by threats, intimidation, or coercion." *Courier v. Nat'l. Bd. of Med. Exam'rs*, 965 N.E. 2nd 829, 837-38 (Mass. 2012). Unlike its federal counterpart, 42 U.S.C. §1983, the Massachusetts Civil Rights Act does not require a party to show that a *government actor* deprive the plaintiff of a constitutional right. *Sena v. Commonwealth* 629 N.E.2nd 986, 993 (Mass. 1994).

210. Defendants Gazda, Monette, Foley, and Funke violated the Massachusetts Civil Rights Act by violating plaintiff's rights under the First and Fourteenth Amendments.

211. As a public employer and/or supervisor, defendants Gazda, Monette, Foley and Funke had a duty to respect plaintiff's rights of free speech, association as a public employee under the First Amendment to the United States Constitution and Part I, Articles II and XVI of the Massachusetts Constitution.

212. Defendants Gazda, Monette, Foley and Funke, through threats, intimidation, and coercion, including, without limitation, initiating a false "Harassment, Bullying, Discrimination, and Hate Crimes Reporting/Complaint against Ms. Manchester, illegally delaying the resolution of that Complaint, signaling to the Baird community that Ms. Manchester was *persona non grata* thus poisoning the atmosphere of Baird against her so that she was treated as a pariah, punishing with diminished performance evaluation, threatening and effecting substantial harm to plaintiff's

58

0066

future professional opportunities and professional reputation, and finally suspending then ultimately terminating plaintiff from her position as a teacher at Baird, interfered with plaintiff's exercise and enjoyment of guaranteed by the United States and Massachusetts Constitutions.

213.    The conduct of defendants Gazda, Monette, Foley and Funke has caused plaintiff to suffer damages including, without limitation, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

**COUNT VI**

**VIOLATION OF EQUAL PROTECTION**

**(Defendants Gazda, Monette, and Ludlow)**

**(42 U.S.C. § 1983)**

214.    Plaintiff realleges each of the allegations set forth in paragraphs 1 through 213 of this Complaint as if the same were fully set forth herein.

215.    Since time immemorial teachers and administrators at Baird have been communicating with parents of students on a wide variety of matters relating to their children's academic, physical, mental, and emotional well-being.

216.    Far from being stigmatized or prohibited as "conduct unbecoming a teacher", such proactive parent-teacher communications were deemed an essential component of the education that the School produced, to the point that such communications were enshrined as a vital criterion in the bi-annual personnel evaluation of teachers. *See supra,* ¶¶ 41-43.

59

0067

217.     Other teachers and administrators at the School similarly situated had regularly exercised their First Amendment rights by communicating with parents on all types of subjects - including those touching upon gender identity. Yet on the record that exists to date, none but plaintiff had ever faced disciplinary action by the School, much less had their employment at the School terminated, as a result of these constitutionally protected communications.

218.     Defendants arbitrarily, capriciously, and without a rational basis subjected Ms. Manchester to discipline, and, ultimately, terminated her employment with the School, simply because she exercised constitutional rights guaranteed by the First Amendment in having a single conversation with the Father of the Female Child that expressed content and a point of view that was disfavored by defendants.

219.     If Ms. Manchester's conversation with the Father of the Female Child had been with anyone other than a parent of the Female Child, then defendants would likely not have disciplined plaintiff, much less terminated her employment with the School, for engaging in that conversation. Conversely, if it had been a teacher other than plaintiff holding views not disfavored by defendants who had conversed with the Father, then defendants would not have disciplined that teacher, much less terminated her employment with the School.

220.     Defendants' selective and disparate treatment of plaintiff was based upon illegal considerations that included, without limitation: (i) an intent to prohibit plaintiff from exercising constitutionally protected rights of speech because she expressed viewpoints with which defendants disagreed; (ii) an intent to prohibit plaintiff from exercising constitutionally protected rights of association with groups disfavored by the school (i.e., parents); (iii) a desire to retaliate against plaintiff for expressing constitutionally protected speech disfavored by the School, most especially for plaintiff's having objected to certain books that the School's former librarian was

0068

making available to children in the School; (iv) the School's false and irrational interpretation of the DESE guidance; and (v) the School's bad faith and malicious efforts retroactively to punish plaintiff based upon a fictitious and retroactively applied School "policy" that purported to prohibit certain forms of communication between teachers and parents.

221. By their conduct, defendants violated plaintiff's right to equal protection under the Fourteenth Amendment to the United States Constitution.

222. Defendants' conduct has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

**COUNT VII**

**VIOLATION OF DUE PROCESS RIGHTS
UNDER THE
FOURTEENTH AMENDMENT**

**(Defendants Gazda, Monette, and Ludlow)**

**(42 U.S.C. § 1983)**

223. Plaintiff realleges each of the allegations set forth in paragraphs 1 through 222 of this Complaint as if the same were fully set forth herein.

224. Defendants were at all relevant times government actors and as such were prohibited from depriving Ms. Manchester, or any person, of "life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1.

225. Defendants' actions violated both the substantive and procedural due process rights of Ms. Manchester.

0069

226. Ms. Manchester's conversation with the Father of the Female Child was protected by the First Amendment.

227. Defendants' suspension and later termination of Ms. Manchester from her position as a teacher at Baird based on that constitutionally protected speech constituted an arbitrary and impermissible deprivation of fundamental liberty and property interests deeply rooted and implicit in the concept of ordered liberty.

228. Further, defendants' pattern of collective conduct towards Ms. Manchester, taken as a whole, constitutes more than mere negligence; rather it descends to the level of malicious intent to injure in a manner that shocks the conscience and hence constitutes a violation of plaintiff's substantive due process rights under the Fourteenth Amendment.

229. Ms. Manchester was first falsely targeted by the Funke Complaint that named defendants Gazda and Monette as corroborating witnesses. *See* Ex. A. As of the date of this Amended Complaint, plaintiff has not been notified of the results of the School's investigation that followed upon the Funke Complaint, and as far as Ms. Manchester knows, the Funke Complaint remains hanging over her head.

230. Assuming that corrective measures were even required when defendants first learned of Ms. Manchester's conversation with the Father, defendants might reasonably have contented themselves with issuing plaintiff a verbal warning, placing a letter of reprimand in her personnel file, or resorting to some other intermediate and proportional form of discipline. Instead, defendants immediately "went nuclear", placing Ms. Manchester on administrative leave and citing the amorphous, arbitrary, and capricious standard of "conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." (*see* Ex. B).

0070

231. At that time, defendants did not cite, could not cite, and cannot now cite, a single School, Ludlow Schools, or Commonwealth policy then in effect, whether articulated orally or in writing, that so much as addressed, much less prohibited, the conduct for which plaintiff was placed on administrative leave and later terminated.

232. Realizing that they were on thin ice legally (and in every other way) for having disciplined an exemplary teacher for speaking to a parent of an at-risk child, defendants began scrambling. They pursued in bad faith a so-called investigation of Ms. Manchester, the outcome of which was preordained and in which Ms. Manchester was denied access to her records, her School laptop, and other materials that any investigation designed to uncover truth rather than to entrap would allow her to have access.

233. But the purpose of defendants' "investigation" was not to discover truth and to create a clean record; the purpose was to obfuscate and trip plaintiff up in the hope of creating a record from which defendants and their counsel could conjure up the civil equivalent of an artificial "process crime", which could then be used to shore up the shaky grounds for their conduct.

234. When the initial phase of the "investigation" involving, *inter* alia, an interview of Ms. Manchester by defendant Monette and School counsel (*see* ¶¶ 148,149) failed to produce the record defendants desired, they tried again: defendant Monette requested a second, follow-up "meeting" with Ms. Manchester (*see* Ex. C).

235. The murky and ambiguous record of that second "meeting" with Ms. Manchester apparently produced the results defendants desired, and it was used, clumsily, to augment the grounds cited for terminating plaintiff's employment. *See supra,* ¶¶ 150-159; *see* Ex. D.

0071

236. Defendants conduct in disciplining plaintiff and ultimately terminating her from her position at the School based upon a retroactive application of non-existent policies, arbitrary and inherently subjective criteria, and unconstitutionally vague standards constituted arbitrary and capricious conduct by defendants that abridged not only plaintiff's constitutionally protected rights of freedom of speech and association but also her right to due process of law under the Fourteenth Amendment.

237. Defendants' conduct has caused plaintiff to suffer damages including, but not limited to, lost income and other economic harm, severe emotional distress, restrictions on her rights of freedom of expression and association, damage to her professional reputation and personal standing in the community, and aggravation of her preexisting medical conditions, in an amount to be determined at trial.

## VI.    GENERAL PRAYERS FOR RELIEF

WHEREFORE, plaintiff asks this Court for the following relief as to all counts:

A)  A declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 that defendants have acted under color of law to deprive plaintiff of her First Amendment rights, in violation of  42 U.S.C. § 1983;

B) A declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, that defendants have acted under color of law to deprive plaintiff of her Fourteenth Amendment right to equal protection of the laws in violation of 42 U.S.C. § 1983;

C) Declare that by the acts set forth in this complaint, and in violation of Mass. G.L. c. 12, §11I, defendants have interfered with plaintiff's exercise and enjoyment of her rights guaranteed by the First Amendment to the United States Constitution and Part I, Article II of the Massachusetts Constitution;

0072

D) Declare that by the acts set forth in this complaint, defendants have unlawfully discriminated against plaintiff in violation of 42 U.S.C. § 2000e-2(a);

E) Enter a declaratory judgment pursuant to 22 U.S.C. § 2201 that the conduct of defendants is unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

F) Declare that by the acts set forth in this complaint, and in violation of Mass. G.L. c. 149, § 185, defendants have unlawfully retaliated against plaintiff;

G) Enter a permanent injunction barring defendant Ludlow from implementing and enforcing any policy that prohibits teachers of students from communicating with parents of those students;

H) Order defendants to reinstate plaintiff to her former position with no loss of seniority or other rights that she enjoyed while employed by the School;

I) Enter judgment against defendants for money damages in the amount of ten million dollars ($10,000,000.00), or an amount to be determined at trial, whichever is greater;

J) Order defendants to pay plaintiff all her back salary, with statutory interest thereon, from May 19, 2021 through the date of the Order;

K) Order punitive damages assessed against defendants for the deprivation of plaintiff's rights under the United States and Massachusetts Constitutions;

L) Compensate plaintiff for three times her lost wages, benefits and other remuneration, and interest thereon, pursuant to Mass. G.L. c. 149, § 185(d)(4);

M) Award plaintiff costs and attorneys' fees, including those pursuant to 42 U.S.C. § 1988 and any other applicable legal authority, and interest; and

N) Award plaintiff such further relief as this Court may deem just and proper.

0073

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action of all triable issues.

Respectfully submitted,

Plaintiff,
**Bonnie A. Manchester**
By her attorneys,
**McNamara & Associates**
**McLane & McLane, LLC**

Date: March 12, 2024

/s/ Frank L. McNamara, Jr., Esq.
Frank L. McNamara, Jr., Esq.
(BBO #339300)
McNamara & Associates
53 Wilder Road
Bolton, MA 01740
Tel: (978) 333-9608
Email: franklmcnamara@gmail.com

/s/ Ryan P. McLane, Esq.
Ryan P. McLane, Esq.
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Tel: (413) 789-7771
Email: ryan@mclanelaw.com

0074

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served upon each party or counsel via electronic mail on March 12, 2024.

/s/ Ryan P. McLane, Esq.
Ryan P. McLane, Esq.
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Tel: (413) 789-7771
Email: ryan@mclanelaw.com

received
1/27/20 9:43Am

File: JICFA-E1

Attachment I

### HARASSMENT, BULLYING, DISCRIMINATION, AND HATE CRIMES REPORTING/COMPLAINT FORM

Complainant's Name  Jordan Funke

Reporter's Name  Jordan Funke

Please describe facts and/or circumstances of the incident or pattern of behavior

Bonnie Manchester has been spreading lies about me and accusing me of sexually exploiting students. I believe this is libel, defamation, and harassment based in part on her perception of my sexual orientation and gender identity.

Summary of any initial action taken:

Administration tried to direct her complaints through official channels, which she has not done.

Date(s) of incident: Starting in September 2019 and ongoing

Time(s) of incident: _____

Names of witnesses, if any: Todd Gazda, Stacy Monette, Michelle D'Amore, Michelle Annecchiarico

Signature of Complainant

*Ludlow School Committee – Approved April 23, 2013*

20

0076

Reproduction text here - document ID - text 03022724 - Page 1 of 1

## Paul R. Baird Middle School

**One Rooney Road * Ludlow, MA 01056**
**(413) 583-5685 * Fax (413) 583-5636**
**Guidance (413) 583-5687 * Nurse (413) 583-5688**

**Mrs. Stacy Monette**
**Principal**

**Mrs. Mary Dobek**
**Assistant Principal**

*Instructional Focus*
*At Baird, we focus on actively participating in our learning and using our critical thinking skills*
*to help us understand and contribute to the world around us.*

March 19, 2021

Ms. Bonnie Manchester
34 Doverbrook Road
Chicopee, MA 01022
March 19, 2021

Dear Ms. Manchester:

I am notifying you that you are being placed on paid administrative leave effective immediately for conduct unbecoming a teacher related to your inappropriate communications with the parents of a student. I will be contacting you to schedule an interview as part of the investigation into this matter. As this meeting may result in disciplinary action, you are reminded of your contractual right to have union representation at the meeting.
Please contact my office if you have any questions

Sincerely,

Stacy Monette
Principal, Baird Middle School

C: Todd H Gazda, Superintendent
Nancy Raymond and Jodi Yarkey, LEA
Personnel File

The Ludlow Public Schools strives to provide a safe, respectful, and supportive learning environment in which all students can thrive and succeed in its schools. The Ludlow Public Schools prohibits discrimination on the basis of race, creed, color, age, sex, gender identity, national origin, pregnancy or pregnancy related conditions, disability or sexual orientation and ensures that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges, and courses of study.

0077

# Paul R. Baird Middle School

One Rooney Road * Ludlow, MA 01056
(413) 583-5685 * Fax (413) 583-5636
Guidance (413) 583-5687 * Nurse (413) 583-5688

**Mrs. Stacy Monette**
Principal

**Mrs. Mary Dobek**
Assistant Principal

### Instructional Focus

*At Baird, we focus on actively participating in our learning and using our critical thinking skills to help us understand and contribute to the world around us.*

Ms. Bonnie Manchester
34 Doverbrook Road
Chicopee, MA 01022

April 6, 2021

Dear Ms. Manchester:

This is a follow up letter to the first letter that was already sent to you regarding an investigation into conduct unbecoming a teacher related to your inappropriate communications with the parents of a student. We are requesting a second meeting on Thursday, April 8th at 1:00 p.m. as a follow up to the March 25th meeting with myself and Rebecca Bouchard where a series of questions were asked pertaining to the incident in question. This next meeting will include further questions regarding inappropriate communication with either parents or others regarding an individual's gender identity contrary to the student's request. Further, you took that action without having any conversation with administration or other colleagues.

As this meeting may result in disciplinary action, you are reminded of your contractual right to have union representation or counsel at the meeting.

Please contact my office if you have any questions

Sincerely,

Stacy Monette
Principal, Baird Middle School

C:     Todd H Gazda, Superintendent
       Nancy Raymond and Jodi Yarkey, LEA
       Personnel File

The Ludlow Public Schools strives to provide a safe, respectful, and supportive learning environment in which all students can thrive and succeed in its schools. The Ludlow Public Schools prohibits discrimination on the basis of race, creed, color, age, sex, gender identity, national origin, pregnancy or pregnancy related conditions, disability or sexual orientation and ensures that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges, and courses of study.

0078

# Paul R. Baird Middle School

One Rooney Road * Ludlow, MA 01056
(413) 583-5685 * Fax (413) 583-5636
Guidance (413) 583-5687 * Nurse (413) 583-5688

**Dr. Stacy Monette**
**Principal**

**Mrs. Mary Dobek**
**Assistant Principal**

### *Instructional Focus*
*At Baird, we focus on actively participating in our learning and using our critical thinking skills
to help us understand and contribute to the world around us.*

May 19, 2021

Bonnie Manchester
34 Doverbrook Road
Chicopee, MA 01022

BY:    First Class and Certified Mail

Dear Ms. Manchester:

Please be advised that, pursuant to M.G.L. c. 71, § 42, I have decided to terminate your employment with the Ludlow Public Schools due to conduct unbecoming of a teacher. Said determination is based upon my review of all of the information before me, including but not limited to your counsel's correspondence dated May 17, 2021. More specifically, you have engaged in the following conduct:

You shared sensitive confidential information about a student's expressed gender identity against the wishes of the student, the direction of the Guidance Counselor, and in contradiction to the Department of Elementary and Secondary Education's (DESE) guidance. This was done without consulting colleagues, the administration, or the student. In fact, you indicated that the only thing you said to the student was that you received the student's email.

If you believed that it was necessary to inform the parents prior to allowing the team to work with the student to determine how best to do so, the appropriate means to express your belief would have been through the so-called Mariners team and/or Guidance Counselor. Indeed, during the Mariner team's meeting on March 3, the Guidance Counselor discussed the email with the team, and you did not raise any issues or concerns regarding notification to the parents. Instead, you took it upon yourself to inform the parent.

You have provided no rationale to explain why you could not have discussed your concerns with the student, the Guidance Counselor, and/or your team. There were certainly numerous appropriate methods to deal with any potential concerns, but instead you failed to raise your concerns with anyone involved in the situation.

Not only did you fail to raise concerns, but you failed to inform anyone that you had told the parent on your own. Contrary to your assertions, this shows a complete lack of concern for the student's well-being. By your own admission, the only thing you stated to the student regarding the email is that you had received it. If you truly had the best interest of the student at heart, you could have spoken with the student and assisted the student with how best to inform the student's parents. Working with the team, this approach would have ensured notification to the parents in a caring and supportive manner. Instead, you blindsided both the student and your team by doing so on your own.

You were untruthful numerous times during the investigation of this matter. First, during the investigation meeting on March 25, 2021, you indicated that you had no communication with the parents regarding the content of the email. However, during the follow-up investigation meeting on April 14, 2021, you admitted that you informed the father that the student was changing the student's name while you were at the father's garage getting an oil change.

0079

Second, you indicated that you read the email, left it on your computer, but did nothing else with the email. Despite being asked numerous times, you insisted that you did not make any type of copy of the email or do anything else with the email. However, your counsel indicated during the meeting that you sent him a copy of the email. A search of your public school email account shows that you did not use said account to email your counsel. Therefore, you clearly made a copy of the email. Further, a search of your public school Google Drive account showed that you took a screenshot of the email (see enclosed). In addition, you cut and pasted the email and created a Google doc of the email wherein you removed the student's name and replaced it with XXXXXX (see enclosed).

Your untruthfulness during the investigation alone is sufficient grounds for termination.

You violated state law and regulations regard student records/privacy as well as the Family Educational Rights and Privacy Act (FERPA) by releasing student information to individuals who did not have the right to view the information. The email contains extremely private and confidential information regarding the student. If you wanted to provide your counsel with the email itself, that request should have been made through the school system. Then, a determination could have been made regarding whether or not the email could be released and/or if redactions were necessary. Instead, you did so on your own volition without any regard for the student's rights.

Since your school account was immediately shut off when you were placed on paid administrative leave, it is also clear that you removed the email from the workplace prior to being placed on leave. Doing so is also a violation of state law and regulations as well as FERPA, and clearly violates the student's rights. It is also further evidence that you were untruthful during the investigation.

The argument that other teachers used educational materials and student records off-site during the pandemic misses the point. Those teachers were using student records for an educational purpose. On the contrary, you were not using the record for an educational purpose and you were not sharing the record with someone that had a legitimate educational interest in the record.

For all of the above reasons, I have decided to terminate your employment with the Ludlow Public Schools effective immediately. Your final paycheck, COBRA information, and unemployment form is enclosed.

Sincerely,

Stacy L. Monette,
Principal

Enclosures

cc:     Personnel File
        Frank McNamara, Jr., Esq. (email)

The Ludlow Public Schools strives to provide a safe, respectful, and supportive learning environment in which all students can thrive and succeed in its schools. The Ludlow Public Schools prohibits discrimination on the basis of race, creed, color, age, sex, gender identity, national origin, pregnancy or pregnancy related conditions, disability or sexual orientation and ensures that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges, and courses of study.

0080

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BONNIE MANCHESTER,

    Plaintiff,

    v.

TOWN OF LUDLOW, et al.,

    Defendants.

Civil Action No. 23-30117-MGM

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
AND MOTION TO STRIKE
(Dkt. No. 18)

April 25, 2025

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

This case arises out of Bonnie Manchester's ("Plaintiff") May 2021 dismissal from her position as a teacher at Paul R. Baird Middle School in Ludlow, Massachusetts. Following her termination, Plaintiff initiated this civil action against the Town of Ludlow, Todd H. Gazda, Stacey Monette, Maire-Claire Foley, and Jordan Funke.[1]

Plaintiff's claims sound in both federal and state law. Relying on 42 U.S.C § 1983, Plaintiff's federal claims allege Defendants Gazda, Monette, and Ludlow engaged in content and viewpoint discrimination thereby violating the First Amendment to the United States Constitution (Count III), retaliated against her for exercising her First Amendment rights (Count IV), denied her the equal protection of the laws as secured by the 14th Amendment (Count VI), and deprived her of her right

---

[1] At the time, Gazda was superintendent of Ludlow public schools. Monette was the principal of Baird. Foley was a guidance counselor at Baird. Funke was formerly the school librarian.

0081

to procedural and substantive due process also secured by the 14th Amendment (Count VII). Plaintiff's state law claims allege Defendants Gazda, Monette, Foley, and Funke intentionally inflicted emotional distress (Count I), engaged in an unlawful civil conspiracy (Count II), and violated the Massachusetts Civil Rights Act (Count V).

In response, Defendants moved to dismiss the operative complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). As relevant to this order, Defendants argue Plaintiff's federal claims are not cognizable constitutional violations. Defendants further assert Plaintiff's complaint contains numerous paragraphs which constitute gratuitous and legally unnecessary attacks on the character of Defendant Funke, thereby justifying an order striking the objectional content from the complaint pursuant to Fed. R. Civ. P. 12(f).

For the following reasons, the court concludes Plaintiff's federal causes of action fail to state a claim upon which relief may be granted. These federal claims are therefore dismissed. Absent a viable federal claim to support subject matter jurisdiction, the court declines to exercise supplemental jurisdiction over Plaintiff's ancillary state law claims, rendering them dismissed without prejudice. Lastly, in view of the foregoing, Defendants' motion to strike is denied as moot.

## II.    BACKGROUND[2]

Baird Middle School serves students in grades six through eight living in Ludlow, Massachusetts. (Dkt. No. 9, ¶ 26.) Plaintiff began teaching at Baird in the fall of 1999. (*Id.* ¶ 27.) Plaintiff was a popular teacher, well-liked by both her students and their parents. (*Id.* ¶¶ 27-32.) She demonstrated an aptitude for working with children deemed "at-risk" because of emotional or behavioral issues which could substantially impair their learning experience. (*Id.* ¶¶ 29-35.)

In the fall of 2020, Plaintiff was assigned to teach a sixth-grade history class. (*Id.* ¶ 114.) This

---

[2] All factual allegations are drawn from Plaintiff's amended complaint and the exhibits annexed thereto. (Dkt. Nos. 9, 9-1, 9-2, 9-3, and 9-4.)

0082

class contained approximately a dozen students and was conducted remotely because of the COVID pandemic. (*Id.*) Plaintiff, like other teachers at Baird, noticed significant behavioral and learning issues among the student body; these issues were attributed to the pandemic and distance learning. (*Id.* ¶ 115.) One of these children, an eleven-year-old, who was born biologically female ("B.F."), caused Plaintiff particular concern. (*Id.* ¶¶ 116-117.)[3] B.F. had previously "always displayed good work habits and was bright, well-adjusted, academically successful, and personable." (*Id.* ¶ 117.) Throughout the fall semester, however, Plaintiff observed the child's behavior "reflect[ed] a depressed demeanor, social detachment, and a marked decline in academic performance characterized by a failure to hand in assignments, poor grades, and a diminished work ethic." (*Id.*) Plaintiff initially contemplated contacting B.F.'s parents, but before she could do so, B.F. requested a one-on-one meeting with Plaintiff in December of 2020. (*Id.* ¶ 118.)

At this meeting, B.F. described suffering from low self-esteem, depression, and social anxiety. (*Id.* ¶ 119.) B.F. further revealed she was questioning her gender identity, but B.F. did not know how to express these questions to her parents. (*Id.* ¶¶ 120-21.) As Plaintiff was familiar with B.F.'s father through his role as an automobile mechanic, she suggested that she would act "as an intermediary and to speak to the parents about the gender identity issues troubling" B.F. (*Id.* ¶ 121.) B.F. accepted the offer. (*Id.*)

Before contacting B.F.'s family, Plaintiff attended a meeting with other Baird teachers to discuss multiple at-risk children, including B.F. (*Id.* ¶ 122.) Two other meeting attendees shared Plaintiff's concerns regarding B.F., and all four meeting attendees felt it was appropriate to contact B.F.'s parents. (*Id.*) Plaintiff subsequently called B.F.'s mother and notified her of the concerns. (*Id.* ¶

---

[3] For clarity and to protect the child's identity, the court will use the child's initials, B.F. The court is aware of the child's initials because it presided over a related case brought by the child's parents against a similar array of Defendants. *See generally Foote v. Town of Ludlow,* No. CV 22-30041-MGM (D. Mass.).

0083

123.) In this conversation, Plaintiff expressly indicated B.F. was questioning her gender identify. (*Id.*)

Shortly after the call, B.F.'s mother emailed multiple Baird teachers and staff, including Defendants Gazda and Monette, requesting no further conversations occur with her child regarding mental health or gender issues. (*Id.* ¶ 124.) B.F.'s mother separately contacted Plaintiff to ask if she would be willing to work outside of school hours with B.F. (*Id.* ¶ 126.)  Plaintiff agreed to help. (*Id.*) She understood her role as two-fold: (i) collaborate with B.F. on various creative projects and (ii) provide information to B.F.'s parents regarding B.F.'s mental health and gender related questions. (*Id.* ¶¶ 127-28.)

In February 2021, B.F. sent several teachers and staff (including Plaintiff and Defendant Foley) an email indicating B.F. now used a new name, planned to identify using alternate pronouns, and was "genderqueer." (*Id.* ¶¶ 130-31.) Defendant Foley then met with B.F., before sending an email to several of B.F.'s teachers (including Plaintiff) requesting they adhere to B.F.'s requests. (*Id.* ¶ 132.) This email indicated B.F.'s preferred pronouns were he/they, but also asked that staff continue to use she/her pronouns when communicating with B.F.'s parents. (*Id.* ¶ 132.) Despite this guidance, neither Ludlow nor Baird had any written or unwritten policy, guidelines, or instructions controlling (or prohibiting) teachers communicating with parents. (*Id.* ¶ 140.) Nor did Ludlow or Baird have any policy regarding the use of students' preferred pronouns or names, when those pronouns or names differed from the ones assigned at birth. (*Id.*)

Plaintiff encountered B.F.'s father in March of 2021 while dropping her vehicle off at his garage. (*Id.* ¶ 141.) The two initially discussed B.F.'s older sibling. The conversation subsequently turned to:

> the phenomenon of gender dysphoria [] then prevalent among certain teens, particularly since the onset of COVID. Ms. Manchester also discussed with the Father efforts then underway by certain teachers and administrators at Baird to assist LGBTQ students in 'regendering', to protect them from bullying and other forms of harassment, and to conceal information from parents, and how all this was a matter of great public concern and controversy among teachers, parents, administers, and

0084

School Committee members, not only in Ludlow but also nationwide. (*Id.* ¶ 143 (parenthetical omitted).) Ultimately, Plaintiff informed B.F.'s father about the February 2021 email sent by B.F. to Baird teachers and staff. (*Id.* ¶ 144.) Plaintiff also indicated her belief the email was written by someone other than B.F. (*Id.*)

This information alarmed B.F.'s parents, particularly in view of their December 2020 email asking that no staff speak to their child regarding mental health, and caused B.F.'s family to seek a meeting with Defendant Monette. (*Id.* ¶¶ 145-46.)  Before this meeting occurred, B.F. informed Defendant Foley that Plaintiff had disclosed the contents of B.F.'s email to the parents. (*Id.* ¶ 146.) Defendant Foley informed Defendant Monette, who then informed Defendant Gazda. (*Id.* ¶ 146.) Defendant Gazda directed Defendant Monette and a Ludlow attorney to initiate an investigation into Plaintiff's disclosure of the information. (*Id.* ¶ 147.)

On March 19, 2021, Defendant Monette informed Plaintiff she was being put on paid administrative leave "for conduct unbecoming a teacher related to your inappropriate communications with the parents of a student." (*Id.* ¶ 148.) This letter cited neither a specific communication nor a specific statute, regulation, protocol, or policy as grounds for the decision. (Dkt. 9-2.) Plaintiff was then interviewed by Defendant Monette and the Ludlow attorney on March 25. (*Id.* ¶ 152.) This was followed by a second interview on April 14. (*Id.* ¶ 155.) Plaintiff was represented by counsel at each interview. (*Id.* ¶¶ 152, 155.)

After a delay of several weeks, Defendant Monette informed Plaintiff she was being terminated. (Dkt. No. 9-4.) Monette's letter provided the following grounds for termination: (1) sharing "sensitive confidential information about a student's expressed gender identity against the wishes of the student, the direction of the Guidance Counselor, and in contradiction to the Department of Elementary and Secondary Education's (DESE) guidance"; (2) alleged untruthfulness during the subsequent investigation; and (3) violations of state and federals laws and regulations

5

0085

governing access to student records. (*Id.*) According to the letter, these acts collectively constituted "conduct unbecoming of a teacher." (*Id.*)

### III.    LEGAL STANDARD

As Defendants' motion is brought pursuant to Fed. R. Civ. P. 12(b)(6), the court applies the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The complaint must therefore allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When evaluating whether dismissal is appropriate under Rule 12(b)(6), the court must credit well-pleaded factual allegations as true and draw all reasonable inferences from those facts in the non-moving party's favor. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013). "Well-pleaded facts must be non-conclusory and non-speculative." *Barchock v. CVS Health Corp.,* 886 F.3d 43, 48 (1st Cir. 2018) (internal quotation omitted). For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc). Generally, the court's review is limited to allegations in the pleadings, but it "may [also] consider 'implications from documents attached to or fairly incorporated into the complaint,'" *Barchock*, 886 F.3d at 48 (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)) (alteration added), as well as "matters of public record, and other matters susceptible to judicial notice," *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (internal quotation marks omitted).

0086

## IV.     DISCUSSION

### A.     Town of Ludlow

Plaintiff has not plausibly alleged any claim sounding in the federal constitution against Ludlow. A municipality may be held liable under Section 1983 only "where the municipality *itself* causes the constitutional violation . . . . *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original; alteration added). To satisfy this standard, *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978) generally requires a plaintiff demonstrate an "affirmative policy decision" which was authorized by the individual or entity endowed with legal authority to set "official municipal policy." *See Thomas v. Town of Chelmsford,* 267 F. Supp. 3d 279, 305-06 (D. Mass. 2017) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) for the first proposition, and quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) for the second proposition). In Massachusetts, "the school committee in each city or town has policymaking authority." *Thomas*, 267 F. Supp.3d at 306; *see also Doe 1 v. City of Holyoke*, 725 F. Supp. 3d 115, 127 (D. Mass. 2024) (citing Mass. Gen. Law ch. 71, § 37).[4]

---

[4] Plaintiff's opposition brief expressly invokes the DESE guidance as the policy justifying a *Monell* claim. Under Mass. Gen. Law ch. 71, § 37, the school committee is the municipal authority with final decision-making power over the adoption of such a policy. *See Sch. Comm. of Pittsfield v. United Educators of Pittsfield*, 784 N.E.2d 11, 16-17 (Mass. 2003). Plaintiff has not articulated a "final authority" theory of municipal liability as to any other policy or act allowing for imposition of municipal liability based on "[a] single decision by a municipal policymaker," who, under state law, possessed final authority to take the challenged action. *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013). Had Plaintiff advanced such a theory, the *Monell* question would be a slightly closer call, as the Massachusetts Education Reform Act of 1993 vested hiring and firing authority in the Superintendent acting through each school's principal. *United Educators of Pittsfield*, 784 N.E.2d at 17-18. But the same statute granting this authority to the superintendent—Mass. Gen. Law ch. 71, § 42—also indicates that when a terminated teacher challenges the action through arbitration then the "school district shall have the burden of proof," and as a practical matter, the school committee steps into the superintendent's shoes to defend the decision. *Id.* (alteration added); *see also Sch. Comm. of Lexington v. Zagaeski,* 12 N.E.3d 384, 389-90 (Mass. 2014) (illustrating the procedure); *Sch. Comm. of Lowell v. Robishaw*, 925 N.E.2d 803, 808-09 (Mass. 2010) ("General Laws c. 71, § 42 . . . places the burden on the school committee to prove the 'just cause' that served as grounds for dismissal."). Regardless, the constitutional claims against Ludlow would fail for the same substantive reasons articulated as to the individual Defendants.

0087

Plaintiff does not allege the Ludlow School Committee adopted an official municipal policy abridging her First Amendment rights, denying her equal protection of the laws, or depriving her of a protected property interest without due process of law. Rather, Plaintiff suggests Ludlow adopted an unwritten and unconstitutional interpretation of the DESE's guidance regarding Mass. Gen. Law ch. 76, § 5, before then relying on this policy to justify firing her. Even accepting this allegation (and her assertion she was unaware of the policy) as true, the First Circuit recently held this unwritten policy was constitutional as a matter of law, as the protocol did not infringe on fundamental rights and has "a rational relationship to the legitimate objective of promoting a safe and inclusive environment for students." *Foote v. Ludlow Sch. Comm.,* 128 F.4th 336, 357 (1st Cir. 2025); *see also id.* at 343, 352-57.[5] The complaint goes on to affirmatively allege there were "never promulgated policies, guidelines, or instructions, written or otherwise, governing teacher communications with parents, much less prohibitions regarding parent-teacher communications . . . [or] address[ing] the use of student's preferred names or preferred pronouns when different from students' enrolled name or birth pronouns" endorsed by the Ludlow School Committee, meaning there is no other well-pled policy basis for a *Monell* claim.. (Dkt. No. 9, ¶ 140 (alterations added).) But even if Plaintiff had articulated a theory of *Monell* liability, the claims against Ludlow would still be dismissed, as Plaintiff has not adequately alleged any violation of the federal constitution for the reasons discussed in detail later. Accordingly, Counts III, IV, and VI, and VII are dismissed for failing to state a claim upon which relief may be granted as to the Town of Ludlow.

---

[5] The court recognizes this was an as-applied challenge. *See Foote*, 128 F.4th at 357. However, as Plaintiff's claim arises from the same incident as *Foote*, the court finds the decision's finding of constitutionality persuasively applicable to this case.

0088

### B.   Individual Defendants

*1.  First Amendment*

*a.  Content/Viewpoint Discrimination (Count III)*

Count III does not state a claim upon which relief may be granted. A claim sounding in the First Amendment's content and viewpoint restriction jurisprudence must preliminarily identify a restriction—typically a statute, administrative regulation, or ordinance—promulgated by the government that is targeting or limiting speech. *See, e.g., McCoy v. Town of Pittsfield, NH,* 59 F.4th 497, 505-07 (1st Cir. 2023) (town ordinance); *Am. Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 574 (1st Cir. 2015) (administrative advertising guidelines); *Sullivan v. City of Augusta*, 511 F.3d 16, 32-33 (1st Cir. 2007) (ordinance); *McGuire v. Reilly*, 386 F.3d 45, 57 (1st Cir. 2004) (statute). Plaintiff does not allege she was prevented from expressing her views on "gender dysphoria" by a governmentally imposed restriction; rather, she alleges Gazda and Monette punished her after they learned she had expressed these views. This is a retaliation theory of liability, not a theory implicating content or viewpoint discrimination as those terms have been articulated by the Supreme Court and the First Circuit. Accordingly, Count III is dismissed.

*b.  Retaliation (Count IV)*

"The right to speak on matters of public concern is guaranteed by the First Amendment." *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024). Public employees do not surrender this right because of their employment status, but "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Consequently, public employees do "not gain any special advantage in disputes of a private nature, such as garden variety employment beefs, merely because the employer happens to be a state actor" because "[t]he First and Fourteenth Amendments do not 'constitutionalize' the employer/employee relationship simply because the employer happens to be a governmental agency."

9

0089

*Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 223 (D. Mass. 2002), *aff'd,* 362 F.3d 1 (1st Cir. 2004).

In evaluating whether Plaintiff has plausibly alleged the conduct in question violates the federal constitution, the court applies the "well-established framework announced by the Supreme Court in *Garcetti*." *MacRae*, 106 F.4th at 133 (internal citation omitted). First, the court asks, "whether the employee spoke as a citizen on a matter of public concern." *Id.* (quoting *Garcetti*, 547 U.S. at 418). If the employee did not, "the inquiry ends there and the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* (internal quotation marks omitted). Assuming the employee did speak as a citizen on a matter of public concern, at step two, the court "must determine whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (internal quotation marks omitted). This requires "balance[ing] the interests of the employee, as a citizen, in commenting upon matters of concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008)). If the government's interest is outweighed by the Plaintiff's interest, the court proceeds to step-three, where it considers whether the protected speech "was a substantial or motivating factor in the adverse employment decision." *Id.*

In her complaint, Plaintiff sufficiently alleges she was not speaking in her official capacity as a Ludlow teacher but rather as a private citizen when speaking with B.F.'s father. According to Plaintiff, this ends the court's analysis because, she says, "[m]atter of public concern' analysis [the next step in the court's review] comes into play only after it is determined that the subject speech was not 'citizen speech' but speech made pursuant to an employee's official duties." (Dkt. No. 34 at 19 (alteration added).) This court views Plaintiff's position as incorrect as a matter of law. Plaintiff would not have a viable First Amendment claim if her comments were made pursuant to her official duties, but the inverse proposition is not also true; she cannot survive a motion to dismiss solely because her

0090

comments were made in a personal capacity. *See MacRae*, 106 F.4th at 127-28, 133, 136 (illustrating *Garcetti* analysis does not end after court finds speech is made in a private capacity); *Decotiis v. Whittemore*, 635 F.3d 22, 27-28, 29-35 (1st Cir. 2011) (same); *Meagher v. Andover Sch. Comm.*, 94 F. Supp. 3d 21, 29-30, 36-37 (D. Mass. 2015) (same); *Oliveira v. Ellison-Lopes*, No. 23-CV-10647-DJC, 2024 WL 126178, at *3-5 (D. Mass. Jan. 11, 2024) (same). Rather, when a government employee speaks on a matter of purely private concern in her personal capacity, the First Amendment is not implicated at all, and she may be disciplined in the same manner as an employee working in the private sector. *Connick v. Myers*, 461 U.S. 138, 147 (1983); *see also Rosaura Bldg. Corp. v. Municipality of Mayaguez,* 778 F.3d 55, 66-67 (1st Cir. 2015) ("If plaintiff's speech is not on a matter of public concern, there is no First Amendment cause of action.").

Turning, as the court must, to whether the speech was on a matter of public concern, Plaintiff narrowly alleges sufficient facts for the court to infer her conversation with B.F.'s father addressed a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick*, 461 U.S. at 147-48)). As relevant here, the Supreme Court previously explained "sexual orientation and gender identity" are "sensitive political topics, and they are undoubtedly matters of profound 'value and concern to the public.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913-914 (2018); *see also MacRae,* 106 F.4th at 136 (accepting parties' representations that gender identity and sexual orientation can constitute matters of public concern); *Meriwether v. Hartop,* 992 F.3d 492, 508-509 (6th Cir. 2021). Baird's policies and procedures (or lack thereof) for addressing complex questions of gender identity raised by middle school students are matters of political or social concern in the community.

11

0091

As the complaint supports an allegation Plaintiff spoke in her personal capacity on a matter of public concern, the court moves to step two of the *Garcetti* framework. Commonly referred to as *Pickering* balancing, *see Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois,* 391 U.S. 563 (1968), this analysis "requires a balancing of the value of an employee's speech against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *MacRae,* 106 F.4th at 136 (quoting *Davignon v. Hodgson*, 524 F.3d 91,103 (1st Cir. 2008)).[6] "The government employer's interest must be proportional to the value of the employee's speech; in other words, the stronger the First Amendment interests in the speech, the stronger the justification the employer must have." *Id.* (internal quotation marks omitted). In weighing the interests, the court considers (1) the time, place, and manner of the speech, and (2) the government's motivation for making the employment decision. *Id.* Ultimately, if "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public . . . then the employee's speech is not constitutionally protected and no First Amendment retaliation claim lies." *Id.* (quoting *Garcetti*, 547 U.S. at 418).[7]

Here, the *Pickering* balance weighs in favor of the Defendants. In the public-school setting, the

---

[6] At oral argument, Plaintiff suggested the court should not engage in *Pickering* analysis because the parties did not raise it in their briefs. However, "resolution of the question is . . . a matter of law for the court to decide." *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 138 (1st Cir. 2022). Once an issue of constitutional law is implicated, the court is obligated to apply the appropriate legal test, regardless of the parties' failure to identify or brief the test correctly. *See Foote*, 128 F.4th at 347 n. 13; *see also Wadsworth v. Nguyen,* 129 F.4th 38, 54 n. 11 (1st Cir. 2025).

[7] *Pickering* balancing is often difficult to engage in at the motion to dismiss stage. The First Circuit has, however, never said it is *per se* impermissible, as it is a question of law for the court to ultimately decide. *See Curran v. Cousins,* 509 F.3d 36, 45 (1st Cir. 2007) (engaging in *Pickering* balancing when examining a motion for judgment on the pleadings); *Garza v. Escobar*, 972 F.3d 721, 728 (5th Cir. 2020) (noting a plaintiff may "plead[] her way into *Pickering* balancing"); *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 783 n. 1 (9th Cir. 1997); *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 619-20 (S.D.N.Y. 2015) (applying *Pickering* to dismiss teacher's complaint), *aff'd*, 665 F. App'x 49 (2d Cir. 2016). Given the degree of detail derived from Plaintiff's own allegations and exhibits, the court does find this to be a case where the well-pleaded facts simply do not survive *Pickering* analysis.

0092

government has a "strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum." *Estock v. City of Westfield*, 806 F. Supp. 2d 294, 308 (D. Mass. 2011) (quoting *Hennessy v. City of Melrose*, 194 F.3d 237, 248-49 (1st Cir. 1999)). It is also a "well-accepted tenet[] that '[t]he successful operation of a [public] school requires the person in charge to be in charge and to maintain close working relationships with each of her teachers.'" *Id.* (quoting *Hennessy*, 194 F.3d at 248) (first alteration added; second and third alterations in original). Additionally, the First Circuit has recognized schools have a "a compelling interest in protecting the physical and psychological well-being of minors," and this interest is "at its apex" when dealing with especially vulnerable children, "such as transgender minors." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 356-57 (1st Cir. 2025) (internal quotation mark omitted). Schools may foster "a space for students to express their identity without worrying about parental backlash" to further this interest. *Id.* at 357. As set forth in the termination letter annexed to the complaint, promoting and protecting these recognized interests was the stated rationale behind terminating Plaintiff for conduct unbecoming a teacher. (Dkt. No. 9-4.)

Compared with these strong governmental interests, Plaintiff's interest in the speech alleged in the complaint was minimal. She was not speaking in a public setting and did not limit herself to discussing Ludlow's policies in general. *See, e.g., Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467-73 (3d Cir. 2015) (affording teacher's blog posts discussing specific students little First Amendment value for purposes of *Pickering*), *as amended* (Oct. 25, 2019); *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1120-21 (7th Cir. 2013) (concluding book written by school guidance counselor was entitled to minimal protection under *Pickering*). Rather, she was discussing these policies and concerns in the context of an ostensibly private conversation with the father of a student for whom the issue of Ludlow's gender related policies was a deeply personal matter. The conversation quickly turned from discussion of Ludlow's broader policies (a public concern) to discussion of the specifics of B.F.'s

13

0093

situation (not a public concern). And, during this discussion, Plaintiff admittedly ignored the request of B.F.'s guidance counselor to not inform B.F.'s parents about the name and pronoun change until B.F. could speak with them. Plaintiff further indicated her belief that Baird faculty were attempting to "regender[]" students and insinuated third-parties authored B.F.'s email to school officials.

Even when considered in a light most favorable to Plaintiff, these actions imperiled harmonious relations among teachers, while usurping the chain of command and delineation of responsibility upon which efficient public education relies. Plaintiff does not plausibly allege this was not the case, but rather alleges she acted to prevent a "grave moral wrong" and avoid setting an "immoral example." (Dkt. No. 9, ¶¶ 172-73.)[8] Beyond the interest in harmony, Plaintiff also undermined Baird's compelling interest in preserving an inclusive and safe environment for B.F., an environment the First Circuit has recognized as most conducive to ensuring the equalization of educational opportunities, by exposing the child to potential parental backlash. *Foote*, 128 F.4th at 357. The complaint alleges Plaintiff had a countervailing "duty and [] responsibility" to tell B.F.'s parents. (Dkt. No. 9, ¶ 172.) But, even accepting as true the assertion such a duty exists, it appears to arise from Plaintiff's own moral code rather than state law or the federal constitution. These beliefs, even if sincerely held, do not insulate Plaintiff from the employment related consequences of her choice to undercut the school's greater (and constitutionally recognized) interest in protecting an inclusive and

---

[8] The complaint contains numerous allegations that these gender related issues were causing tremendous tensions between teachers and parents at Baird. (*See, e.g.,* Dkt. No. 9, ¶¶ 9, 47- 106, 124-140, 143, 146-47; Dkt. No. 9-1.) These factual allegations undercut the bald assertion that "Ms. Manchester in her friend-to-friend conversation with the Father did not affect in any way the operations of the School or impair its ability to operate efficiently and effectively." (Dkt. No. 9, ¶ 171.) Similarly, the court does not credit the conclusion that "nothing in the record compiled to date suggests the sort of parental dysfunctionality that would result in harm to the Female Child as a result of plaintiff's conduct." (Dkt. No. 9, ¶ 171.) As articulated in *Foote*, Baird's interest in preserving an inclusive and safe environment could rationally justify a blanket instruction that teachers not "offer information—[regarding] a student's gender identity—without a student's consent." *Foote*, 128 F.4th at 355 (alteration added); *see also id.* at 357.

0094

safe environment for transgender minors as a matter of law. Therefore, the content and context of Plaintiff's speech, "while touching on matters of public concern, did not outweigh the school's considerable interest as an employer in guarding against the impairment of relations among teachers," preventing insubordination, and preserving an inclusive school environment. *Hennessy*, 194 F.3d at 247-48. Accordingly, Count IV is dismissed.

    *2. Equal Protection (Count VI)*

Plaintiff's equal protection claim requires she adequately allege that "compared to others, similarly situated, [she] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Lay v. City of Lowell*, --F. Supp.3d--, No. CV 24-10514-NMG, 2024 WL 5076365, at *4 (D. Mass. Dec. 11, 2024) (alteration added) (quoting *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 9 (1st Cir. 2007)); *see also Rectrix Aerodrome Centers, Inc. v. Barnstable Mun. Airport Comm'n*, 610 F.3d 8, 15 (1st Cir. 2010). Uniquely, in the public employment context, the Supreme Court has expressly held that "the class-of-one theory of equal protection has no application," meaning Plaintiff must allege she is a member of a protected class, or that the state action impinges upon a fundamental right. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 607 (2008). There are no allegations Plaintiff belongs to a protected class, as this typically "involves characteristics that define a discrete group, which are generally immutable or otherwise not within the members' control." *N. End Chamber of Com. v. City of Bos.*, --F. Supp.3d--, No. CV 24-10039-LTS, 2024 WL 5197557, at *6 n. 7 (D. Mass. Dec. 20, 2024). Plaintiff instead alleges she was discriminated against for exercising her First Amendment rights.

Plaintiff, however, does not state an equal protection claim sounding in fundamental rights for two independent reasons. First, her "equal protection claim fails because it is a mere restatement of its First Amendment claim and based on the same facts." *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 68 (1st Cir. 2015) (alteration added). "[R]etaliation claims under the First

0095

Amendment cannot be restated as claims under the Equal Protection Clause." *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 426 (1st Cir. 2010).[9] Next, she has also not alleged the existence of an individual who was "similarly situated [to Plaintiff] in all relevant respects," but treated more favorably. *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (internal quotation marks omitted); *see also McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, 508 (1st Cir. 2023) (explaining equal protection claim sounding in a fundamental rights theory typically requires an appropriate comparator); *Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93, 113 (1st Cir. 2020) (same); *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011) (dismissing complaint for failing to plead existence of an appropriate comparator as required to allege discriminatory animus).[10] The complaint refers generally to several other teachers who protested or spoke out against Ludlow's gender policies. But these proposed comparators are not similarly situated, as there is no indication any of them engaged in these activities *and* spoke to the parent of a child questioning their gender identify outside of school grounds, thereby directly contravening a request from the child's guidance counselor. Count

---

[9] Plaintiff argues several of the allegations underlying the equal protection claim are "analytically distinct from those giving rise to Plaintiff's First Amendment claim." (Dkt. No. 34 at 26.) But upon review each of the listed allegations plainly implicates the First Amendment, not the Equal Protection Clause. (Dkt. No. 9, ¶ 220.)

[10] A comparator is not always necessary to state an equal protection claim. *See Wadsworth v. Nguyen,* 129 F.4th 38, 54 (1st Cir. 2025); *see also id.* at 72-74 (Rikelman, J., concurring). Rather, allegations that a similar situated comparator exists are a proxy used to demonstrate the discriminatory animus necessary to allege such a claim. *See id.* at 72; *Fincher v. Town of Brookline*, 26 F.4th 479, 486 (1st Cir. 2022). (explaining, "in the absence of direct proof that racial animus caused the adverse action," comparator evidence is necessary to sustain an equal protection claim). Here, there are no well pled factual allegations, as opposed to legal conclusions couched as factual allegations, supporting a plausible inference Defendants Gazda or Monette acted with "an invidious discriminatory purpose." *Donahue v. City of Bos.*, 371 F.3d 7, 14 (1st Cir. 2004) (quoting *Washington v. Davis,* 426 U.S. 229, 242 (1976)). In the absence of such allegations, Plaintiff was required to allege the existence of appropriate comparators to sustain her equal protection claim, as "[a]n equal protection claimant may not prevail [against a Rule 12(b)(6) motion] simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." *Zell v. Ricci*, 957 F.3d 1, 13-14 (1st Cir. 2020) (first alteration added; second alteration in original; internal quotation marks omitted).

16

VI is therefore dismissed.

      3.   *Due Process (Count VII)*

      a.   *Procedural Due Process*

To state a procedural due process claim, Plaintiff must allege (1) she was deprived of a protected property interest, and (2) this deprivation was accomplished without adequate process. *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008). As the parties do not dispute Plaintiff's continued employment as a teacher is a property right created by state law, the court's analysis focuses solely on whether Plaintiff adequately alleges her termination was accomplished without adequate process.

Generally, "the essential components of a pretermination due process hearing [are] 'oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story.'" *Lawless*, 63 F.4th at 67 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)) (first alteration added; second and third alterations in original). Massachusetts General Law Ch. 71, § 42 effectuates these procedural guarantees by requiring school districts provide tenured teachers with written notice of the grounds for termination in sufficient detail for the teacher to respond. *Id.* Tenured teachers are also entitled to review all documents related to or supporting the dismissal. *Id.* They then must have an opportunity to meet with school officials in the presence of counsel before termination. *Id.* These procedures satisfy *Loudermill*'s minimal requirements, as "the purpose of the termination hearing is solely to serve as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Chmielinski v. Massachusetts*, 513 F.3d 309, 316 (1st Cir. 2008) (quoting *Loudermill*, 470 U.S. at 545-46); *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 23-24 (1st Cir. 1999) (discussing *Loudermill*'s requirements in the context of Section 42).

0097

Under Section 42, Plaintiff received all the formal pretermination process she was due. She was alerted to the charges against her through a letter sent well before her ultimate termination. Plaintiff and her counsel then met with school officials not once but twice to discuss the matter, providing an opportunity to be heard regarding her version of events and an opportunity to learn in further detail the nature of the allegations against her. Even when viewed in a light most favorable to Plaintiff, Defendants met their obligations imposed by *Loudermill*, as "[t]o require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546.

Plaintiff next alleges that, even if her termination was accomplished through nominal adherence to the established procedures, several factors combined to render her pretermination hearing constitutionally insufficient as a practical matter. Specifically, she claims she was denied access to her school records, she had no opportunity to present or question witnesses, the questions posed to her at these hearings were less than precise, and her claim was heard by a biased decisionmaker. But "[m]ost of [Plaintiff's] allegations are a call to transpose the procedural protections of a court of law into [her] termination hearing." *Chmielinski*, 513 F.3d at 316 (alteration added). The First Circuit has previously held parties do not have a constitutional right to pre-hearing discovery, nor do they have a right to present and question witnesses. *Id.* at 316-17. Moreover, "the allegations involved [Plaintiff's] own conduct, known to [her]" and "[f]rom this [she] could testify and assemble a defense." *Id.* at 317. And while novel, Plaintiff's assertion her questioning was so inartful as to violate due process is not grounded in the law; inartful questioning does not rise to the level of a constitutional violation as nothing constitutionally requires "the state follow best practices." *O'Neill v. Baker*, 210 F.3d 41, 49 n. 10 (1st Cir. 2000). Similarly, Plaintiff's bias allegations are an unpersuasive rationale on which to rest a procedural due process claim, as "there is not even a basic requirement that hearing officers be impartial in the employment context," and "it is clearly established that employing authorities may

**0098**

preside at termination hearings even though they instituted the termination proceedings." *Lawless*, 63 F.4th at 68; *see also Acosta-Sepulveda v. Hernandez-Purcell,* 889 F.2d 9, 12 (1st Cir. 1989) ("Contrary to the district court's premise, it is not required that a hearing be conducted before an impartial decisionmaker.").

Finally, even if the individual Defendants failed to afford Plaintiff the pretermination process that she was entitled to receive, the complaint still fails to state a claim upon which relief may be granted. Under the *Parratt-Hudson* doctrine, "if a state provides adequate postdeprivation remedies— either by statute or through the common-law tort remedies available in its courts—no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct occasioned the deprivation." *Lowe v. Scott*, 959 F.2d 323, 340 (1st Cir. 1992) (citing *Parratt v. Taylor,* 451 U.S. 527 (1981) and *Hudson v. Palmer,* 468 U.S. 517 (1984)); *see also Lawless*, 63 F.4th at 69 n. 6; *Toney v. Guerriero*, 633 F. Supp. 3d 404, 407-08 (D. Mass. 2022), *aff'd*, No. 22-1822, 2023 WL 7321897 (1st Cir. Sept. 1, 2023). Section 42 offered Plaintiff an avenue to challenge her termination through arbitration before a neutral arbitrator provided by the American Arbitration Association, but she apparently did not do so. *See Atwater v. Comm'r of Educ.,* 957 N.E.2d 1060, 1069 (Mass. 2011) ("[W]here a teacher's right to continued employment is created by statute, the Legislature permissibly may require arbitration as the method of dispute resolution where a teacher is dismissed and chooses to review the dismissal decision."); *see also Senra v. Town of Smithfield,* 715 F.3d 34, 39 (1st Cir. 2013); *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 102 (1st Cir. 2002). Because of her failure to pursue arbitration, she cannot bring procedural due process claims against these Defendants, as "the Due Process Clause of the Fourteenth Amendment does not turn into 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 481 (1st Cir. 2012) (en banc) (quoting *Albright v. Oliver,* 510 U.S. 266, 284 (1994) (Kennedy, J., concurring)).

0099

*b.   Substantive Due Process*

In addition to procedural due process, "the Supreme Court has held for nearly one hundred years that the Due Process Clause's explicit promise of 'liberty' ensures certain fundamental rights." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 345 (1st Cir. 2025). These fundamental rights are protected by "[t]he constitutional guarantee of substantive due process." *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 15 (1st Cir. 2011) (alteration added).

Before analyzing whether the government's conduct violates substantive due process, the court must "begin[] by asking whether the challenged government conduct is legislative or executive in nature," as this distinction determines the legal standard applied to assess the conduct's constitutionality. *Foote*, 128 F.4th at 345 (alteration added; internal quotation mark omitted). Executive acts are reviewed using the shocks-the-conscience approach, while legislative acts are categorized based on the fundamental right they restrict (or lack thereof), then assessed using the appropriate degree of constitutional scrutiny (*e.g.,* strict scrutiny, intermediate scrutiny, or rational basis). *Id.* at 346. In general, statutes, administrative regulations, executive orders, and governmental policies "are typically deemed legislative," as they are generally "broadly applicable." *Id.* at 345. By contrast, "individual acts of government officials are often and ordinarily executive in nature, untethered from any policy." *Id.* As persuasively relevant here, "[e]xecutive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 n. 1 (3d Cir. 2000) (Alito, J.); *see also Littlejohn v. Sch. Bd. of Leon Cnty., Fla.,* 132 F.4th 1232, 1242 (11th Cir. 2025) (noting a "school board rule of general applicability" is legislative, but an "administrative decision" impacting "only a limited class of persons" is executive). Plaintiff challenges "a specific act of [two] governmental officer[s]"—her termination from public employment; this specific act does not apply to or impact a broad swath of society but, rather, was felt entirely by this

0100

Plaintiff. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (alterations added); *see also Mirabella v. Town of Lexington, Massachusetts,* 64 F.4th 55, 56 (1st Cir. 2023) (affirming use of shocks-the-conscience test in the municipal employment context); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 647 (D. Mass. 2015) (applying the shocks-the-conscience test in the municipal employment setting); *Dobelle v. Flynn*, 12 F. Supp. 3d 274, 290-91 (D. Mass. 2014) (same). The complaint therefore challenges an executive act.

Having categorized the challenged government conduct as executive, it is appropriate to apply the shocks-the-conscience test to determine whether Defendants' conduct violated substantive due process. *Foote*, 128 F.4th at 346. Under this standard, Plaintiff "must show *both* that the [governmental] acts [complained of in the complaint] were so egregious as to shock the conscience *and* that they deprived [her] of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in original; alterations added). "Only after show[ing] a constitutionally significant level of culpability may a plaintiff turn to establishing that a protected right was offended." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020). Plaintiff has not alleged the requisite degree of culpability, as Plaintiff's termination for engaging in an unauthorized discussion with B.F.'s father was not a violation "of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (internal quotation mark omitted; alteration in original); *see also Amsden v. Moran,* 904 F.2d 748, 754 n. 5 (1st Cir. 1990) ("In the substantive due process context, the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error."). Substantive due process is intended to prevent governmental conduct that strays "too close to the rack and the screw," *Rochin v. California*, 342 U.S. 165, 172 (1952); these stringent requirements are not satisfied by allegations that amount to an employment dispute regarding

0101

whether Plaintiff was fired for sufficient cause and with sufficient process, *see, e.g., Cummings v. City of Newton*, 298 F. Supp. 3d 279, 288 (D. Mass. 2018); *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 647-48 (D. Mass. 2015); *McCann v. City of Lawrence*, 659 F. Supp. 2d 243, 250 (D. Mass. 2009).

Finally, in addition to not alleging conscience-shocking behavior, the complaint also fails to identity a fundamental right protected by substantive due process. "Substantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n. 13 (1st Cir. 2010) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997)). The right to continued public employment is not such a right because, as the Eleventh Circuit persuasively explained:

> Supreme Court precedent demonstrates that an employee with a property right in employment is protected only by the procedural component of the Due Process Clause, not its substantive component. Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection

*McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc); *see also Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021) ("Officer Nelson asserts that she has a property interest in her job. But if she intended her job to be a basis of her substantive due process claim as well, that theory fails."); *Santiago de Castro v. Morales Medina*, 943 F.2d 129, 131 (1st Cir. 1991) (cautioning against allowing substantive due process to "embroil federal courts in everyday workplace disputes between employers and their employees"); *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 223 (D. Mass. 2005) (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J. concurring), explaining substantive due process only protects rights arising from the federal constitution); *cf. Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1979) (declining to find the right to public employment fundamental for purposes of triggering strict scrutiny under the Equal Protection Clause). Furthermore, to the extent

0102

Plaintiff relies on the First Amendment as the source of her asserted fundamental right, this count is "coextensive with h[er] First Amendment claim," meaning "there is obviously no need to enter the uncharted thicket of substantive due process to find an avenue for relief" when Plaintiff has not identified an underlying violation of the First Amendment. *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 46 (1st Cir. 1992) (alteration in first quotation added).

Accordingly, Count VII is dismissed in its entirety.

### C.    Supplemental Jurisdiction and Motion to Strike

Plaintiff's remaining claims—Counts I, II, and V—all arise out of Massachusetts law. Although the complaint attempts to invoke this court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1), Plaintiff is a citizen of Massachusetts, as are Defendants Monette and Foley. (Dkt. No. 9, ¶¶ 14, 19, 22-23.) Diversity jurisdiction is therefore improper, as Section 1332(a)(1) only applies when "the citizenship of each plaintiff is diverse from the citizenship of each defendant." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996); *BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 695 (1st Cir. 2023) ("[N]o plaintiff may be a citizen of the same state as any defendant."). Thus, the court's jurisdiction is based solely on 28 U.S.C. § 1331 (federal question). The court consequently declines to exercise supplemental jurisdiction over the state law claims in the absence of any viable federal claims. *See Sexual Minorities Uganda v. Lively*, 254 F. Supp. 3d 262, 270 (D. Mass. 2017), *aff'd in part, appeal dismissed in part*, 899 F.3d 24 (1st Cir. 2018); *see also Lambert v. Fiorentini,* 949 F.3d 22, 29 (1st Cir. 2020). Accordingly, these claims are dismissed without prejudice.

In addition, the court finds Defendants' motion to strike is now moot. However, the court does note that the complaint frequently uses overheated language and makes gratuitous personal attacks that are not legally necessary or relevant to the claims at issue in this case. Including legally unnecessary language in filings risks "degrad[ing] the dignity and decorum of the court and hamper[ing] 'the orderly and expeditious disposition of cases.'" *Arunachalam v. Int'l Bus. Machines Corp.*,

23

0103

989 F.3d 988, 1001 (Fed. Cir. 2021) (alteration added) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)); *McLeod v. Fessenden Sch.,* 626 F. Supp. 3d 220, 223 (D. Mass. 2022) (striking "inappropriate editorial statements"); *Nwaubani v. Grossman*, No. CV 13-12552-JLT, 2014 WL 12914528, at *3 (D. Mass. Feb. 28, 2014) ("A complaint should not be 'swollen with irrelevant rhetorical flourishes.'" (quoting *Sherwood Forest Neighbors Ass'n, Inc. v. Town of Becket*, 466 F. Supp. 2d 399, 401 (D. Mass. 2006))). The court recognizes the issues implicated by this case are sensitive, and for the parties highly personal, but all participants in the civil justice system should strive to adhere to high standards of civility.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. (Dkt. No. 18.) This case may now be closed.

It is So Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge

24

0104

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Bonnie Manchester
Plaintiff,

    v.

Town of Ludlow, et al.,
 Defendants,

      Civil No. 23-30117-MGM

ORDER OF DISMISSAL
April 25, 2025

**MASTROIANNI, U.S.D.J.**

  Pursuant to the Memorandum and Order (Dkt. No. 37) issued on April 25, 2025, it

is hereby ORDERED that the above-entitled action be and hereby is dismissed.

        By the Court,

April 25, 2025      /s/ *Mark G. Mastroianni*
Date         Mark G. Mastroianni
          U.S. District Judge

0105

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

BONNIE A. MANCHESTER,

          Plaintiff

v.

TOWN OF LUDLOW,
TODD H. GAZDA, individually and in his
official capacity as former Superintendent of
Schools, Ludlow Public Schools,
STACEY MONETTE, individually and in her
official capacity as former Principal of Paul R.
Baird Middle School,
MARIE-CLAIRE FOLEY, individually and in
her official capacity as former school counselor
of the Paul R. Baird Middle School, and
JORDAN FUNKE, individually and in her
official capacity as former librarian of the Paul
R. Baird Middle School,

          Defendants

Civil Action No. 3:23-cv-30117

**Notice of Appeal**

       Notice is hereby given that Bonnie A. Manchester, the plaintiff in the above-named matter, hereby appeals to the United States Court of Appeals For the First Circuit from the Decision entered in this action on April 25, 2025 (Dkt. 37 and 38), in the United States District Court for the District of Massachusetts, granting the Defendants' Motion to Dismiss, and entering an Order Dismissing the Case.

1

0106

Respectfully submitted,


/s/ Ryan P. McLane, Esq.
Ryan P. McLane, Esq.
(BBO #697464)
McLane & McLane, LLC
269 South Westfield Street
Feeding Hills, MA 01030
Tel: (413) 789-7771
Email: ryan@mclanelaw.com

CERTIFICATE OF SERVICE

I, Ryan P. McLane, certify that I have caused a copy of this Notice of Appeal to be served to the Defendant's counsel of record by ECF on May 23, 2025.

May 23, 2025                                    /s/ Ryan P. McLane, Esq.
                                               Ryan P. McLane, Esq.

2

0107

## CERTIFICATE OF SERVICE

I hereby certify that on, I caused the foregoing to be filed electronically with this Court on September 22, 2025. Service will be effectuated on the following via the Court's ECF/electronic notification system:

David S. Lawless
Nancy Frankel Pelletier
ROBINSON DONOVAN, P.C
1500 Main Street, Suite 2300
Springfield, MA 01115
dlawless@robinsondonovan.com
npelletier@robinsondonovan.com
Tel. (413) 732-2301
Attorneys for Defendants-Appellees

/s/ *Mary E. McAlister*
Mary E. McAlister
*Attorney for Plaintiff-Appellant*